**Exhibit 1**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

WE, LLC, d/b/a WILD ENCANTOS,　　　　:

　　　Plaintiff,　　　　　　　　　　: CIVIL NO.: 3:24-cv-01185(CVR)

vs　　　　　　　　　　　　　　　　　: RE: COPYRIGHT INFRINGEMENT

CARIBBEAN RETAIL VENTURES, INC., :

SALOMON ABADI, Jane Doe, and　　　:

their conjugal partnership,　　　　:

JOEL BENDER, Susan Roe, and　　　　:

their conjugal partnership,　　　　:

　　　Defendant(s)　　　　　　　　　:

-----------------------------------

TAKING OF THE DEPOSITION OF:

ANGEL RODRÍGUEZ-MIRANDA

DATE　　　:　　December 5, 2025

TIME　　　:　　9:00 A.M.

PLACE　　:　　Adsuar, Muniz, Goyco, Seda & Pérez-Ochoa, PSC

　　　　　　　　Banco Popular Building, 16th Floor

　　　　　　　　Munoz Rivera Avenue, Puerto Rico, 00918

Electronically signed by Rafael Vega-Quijano (601-267-767-2205)　　　　　　　7872cd50-c738-44f1-a2de-300a6194db9a

Page 2

A P P E A R A N C E S

FOR DEFENDANTS:    ALEXANDRA CASELLAS-CABRERA, ESQ.

Adsuar, Muniz, Goyco, Seda & Pérez-Ochoa, PSC

Banco Popular Building, 16th Floor

Munoz Rivera Avenue, Puerto Rico, 00918

LUIS PÉREZ-GIUSTI, ESQ.

FOR PLAINTIFFS:    JANE BECKER-WHITAKER, ESQ.

P.O. BOX 9023994

San Juan, Puerto Rico 0962

DEPONENT:    MR. ANGEL RODRÍGUEZ-MIRANDA

NOTARY PUBLIC:    ARNALDO LABOY-CASTRO, ESQ.

COURT REPORTER:    MR. RAFAEL A. VEGA-QUIJANO

Vega Reportage

Electronically signed by Rafael Vega-Quijano (601-267-767-2205)    7872cd50-c738-44f1-a2de-300a6194db9a

Page 18

business, and then you're employed for the T.V. side business, okay. Do you have any other side businesses or are there any other business ventures that you're involved with other than what you have mentioned?

A.    (NO AUDIBLE RESPONSE FROM DEPONENT.)

Q.    And, you serve as President of Wild Encantos, correct?

A.    Yes.

Q.    So, when did you first assume that role?

A.    2017.

Q.    That was when Wild Encantos was created?

A.    2017, 2016.

Q.    And, what are your responsibilities as President of Wild Encantos?

A.    I am a one man show.

Q.    Can you talk to me a little bit about that? So, you run the day-to-day operations of the company?

A.    I run the day-to-day operations, everything. I pretty much do everything. The only thing I have is I have a merchandiser that goes around and distributes and fulfills the orders, but the first contact with the client, the orders with the suppliers, the logistics, the shipping, everything.

Q.    And, do you oversee... you're in charge of the product design and the product manufacturing?

A.    Uh huh, yes.

Q.    And, what about customer relationships. You said that

darker toes, one color in the back, lighter color in the belly, and the Puerto Rican flag stitched to it.

Q.   Okay, fine. On those pictures, we're referring to... from what I'm seeing, in front, I have the first image... it's a coqui on the left, and then the second image is a coqui on the right. Those are the ones that are owned by Wild Encantos?

A.   Yes.

Q.   Okay, great. Now, you can see the table. I have placed a series of plush toys in front of you. Can you identify which one of those is the one that you are alleging here that was... that is similar to Defendant's?

(DEPONENT IDENTIFIES ITEM FOR BENEFIT OF THE RECORD.)

BY MS. CASELLAS-CABRERA:

Q.   Okay, but which one is Wild Encantos?

A.   This one... these two.

Q.   So, you're referring to these two?

A.   Uh huh.

MS. CASELLAS-CABRERA: And, we're going to mark... as we've done before, what we're going to do is identify these plush toys here. We're going to identify them with a sticker. But, after the deposition is over, we'll take pictures, and then those will substitute for purposes of the transcript the Exhibits.

MS. BECKER-WHITAKER: Right.

MS. CASELLAS-CABRERA: Okay, okay.

BY MS. CASELLAS-CABRERA:

Q.   So, you pointed out to two specific coquis?

A.   Uh huh.

Q.   So, however what I'm seeing here...

MS. CASELLAS-CABRERA: And, let's mark them so it's easier for us to move forward. Should we mark them separately?

MS. BECKER-WHITAKER: Yes.

MS. CASELLAS-CABRERA: Okay, so...

COURT REPORTER: This one will be three.

MS. CASELLAS-CABRERA: ... this one will be three, and I've named that I.D. ... so we've identified as Exhibit 3... it's going to be as I've named this, Plaintiff's Coqui Complaint.

(Whereupon,

the above-mentioned photograph was marked as Exhibit 3 to the deposition.)

MS. CASELLAS-CABRERA: And, then the other one that we're going to mark is going to be four, and we're going to name that Plaintiff's Coqui Other.

(Whereupon,

the above-mentioned photograph was marked as Exhibits 4 to the deposition.)

BY MS. CASELLAS-CABRERA:

Q.   But, from the picture and from the Complaint, you are

Q.   Okay, are you aware that... I'm going to pinpoint you to Exhibit 1. Are you aware that the Notice of Deposition had a Request for Document Production?

A.   I mean a copyright is a public document.

Q.   Is that your understanding, that it's a public document?

A.   Uh huh, yes.

Q.   And, have you seen a... have you seen that document, that Certificate of Registration?

A.   Yes.

Q.   And, when was the last time you saw that?

A.   I keep that on file at the office. I mean...

MS. CASELLAS-CABRERA: Okay, well, then I'll request that you provide that because we have not received a Certificate of Registration issued by the Copyright Office on any of the coquis nor the parrot.

So, I'll make that in writing. It's been a few times that I've requested this, but I'll do it again.

DEPONENT: Okay.

BY MS. CASELLAS-CABRERA:

Q.   Other than this document, do you have any access to your electronic records that you might be able to access that document and provide it to us while we're here, in the deposition?

A.   No, it's a document from early 2000, so I don't... you

else other than this document that you have in your office?

A.   It's in a file. Those documents all related to the protection that we have they are in that file now.

MS. CASELLAS-CABRERA: Okay, and the file that we have requested, and we will make a formal request for the production of.

BY MS. CASELLAS-CABRERA:

Q.   What about the Coquico case, are you relying on that case and in any decision by the Court to support that these are somehow protected, that the coqui is somehow protected?

A.   It is protected because I... it was well discussed in the previous case, in the Coquico case, the Coquico copyright infringement case, not the Coquico collection case.

Q.   So, your understanding is that, since it was discussed and it shows there is evidence that...

A.   That was presented in Court, in Federal Court.

Q.   What was presented in Federal Court?

A.   The whole evidence. I mean this case was... what... 2010, fifteen years ago.

Q.   So, you're saying that the entire evidence of the copyright case was presented in that case...

A.   Uh huh.

Q.   ... and you were found liable for copyright infringement. So, you're assuming that that means that this is a protected design? Is that your understanding?

Page 34

A.   It is a protected design.

Q.   So, it's fair to say that you're relying also on that decision by that Court?

A.   Well, I'm relying on the documents that we have, those documents that I own, and what has been the result of this whole long process of litigation.

Q.   Have you ever... you, as the representative, or anyone in Wild Encantos, filed an application for registration of any of your coquis? Have you personally done that?

A.   No.

Q.   No.

COURT REPORTER: I couldn't hear an answer.

A.   Well...

COURT REPORTER: I didn't hear an answer.

A.   Okay, we have, we have. We have filed for our latest one in the Sapo Concho.

BY MS. CASELLAS-CABRERA:

Q.   Okay, so the Sapo Concho. But, that is not one of the two that are involved.

A.   That's not involved in this.

Q.   Okay, so my question again...

A.   This was done by Coquico, by my partner. When I won the case, part of the procedures of collecting any assets that they might have, one of the assets was the copyright. So, the copyright documents turned to me, and now they belong to me.

Q.   So, the answer is that you haven't... Wild Encantos has not filed an application for registration in the Copyright Office for the coquis. The application of any was filed by Coquico before you acquired those rights. Is that correct?

A.   Yes.

Q.   Now, let's talk about the parrot. And, I'm showing you again the Amended Complaint, if you could go back to that. That is Exhibit 2.

And, again, can you show me from those images which one is the parrot that Wild Encantos owns?

A.   The prettier one.

Q.   Which is that?

A.   This one right here. It's the one on the left.

Q.   Okay, the one on the left. So, the one on the left of you in the Amended Complaint, correct?

A.   Uh huh, yes.

Q.   And, the same thing that we did before. From those on the table, please can you select the one that Plaintiff owns.

A.   Mine?

Q.   Yes.

A.   Right here.

MS. CASELLAS-CABRERA: So, we'll mark this. I'm holding a small parrot, green, with a handtag that says "Wild Encantos", and we're going to be... this is going to be Exhibit 5.

(Whereupon,

the above-mentioned photograph was marked as Exhibit 5 to the deposition.)

BY MS. CASELLAS-CABRERA:

Q.   And, the same question that I've made before. Do you have registration evidence that this parrot is registered in the Copyright Office?

A.   Definitely, yes (phonetic).

Q.   And, where is that information? Where is that document?

A.   It's in the same file.

Q.   The same file. You don't know the registration number by heart?

A.   No, I don't.

Q.   You don't. And, what about the title of the work, do you know under what title is that...

A.   It's under Tata because the scientific name is Amazona Vittata.

Q.   And, I did not ask that for the coqui. Do you know if it has a title?

A.   Común.

Q.   Común?

A.   I think it was... I believe it was Coqui Común.

Q.   So, your understanding is that the title of the copyright registration of the coqui is Común?

A.   That's what I recall. I mean it might be Coqui, it

might be Común. I mean something along those lines.

MS. CASELLAS-CABRERA: Okay, well, again I will be asking formally for the file and for the evidence that this... for the Certificate of Registration for the Tata design.

BY MS. CASELLAS-CABRERA:

Q. With those documents that we just talked about that are part of your record, do you recall if you have the deposit material? Do you know what the deposit materials are?

A. What's the deposit materials?

Q. Okay, so, when you file a copyright application, you file documents evidencing the look or the design that you're actually filing so the Copyright Office can analyze that design, and determine if it's copyrightable (sic) or not. So, basically you're showing like pictures or images of what you're intending to file.

Do you know if, within your records, you have evidence of those deposit materials?

A. Well, that was done through my former partner, and it was... they submitted everything to the Copyright Office in terms of patterns, looks, colors and stuff like that.

Q. Okay, so that was done by your previous partner?

A. Yes.

Q. And, I'll ask about that in just a minute. And, again, for the parrot, you have not... and Wild Encantos has not filed

business?

A. Because I was busy here with sales.

Q. And, do you recall being part... or reviewing those documents or being part of that application process or that was entirely conducted by him?

A. That was entirely conducted by him.

Q. So, I understand, from your allegations, that Malik registered on behalf of Coquico. Coquico owned the rights to the plush toys, to the designs and the copyright. Is that correct?

A. Yes.

Q. And, then you acquired them?

A. Uh huh.

COURT REPORTER: You have to verbalize.

A. Yes, yes, yes.

BY MS. CASELLAS-CABRERA:

Q. And, you acquired...

A. I pretty much financed that whole operation in those years, and never got money back.

Q. And, you acquired them as part of the collection case that we've discussed, correct?

A. Yes.

Q. Okay, can you take me through that process on how you won the collection case, and how you acquired the rights to the Coquico?

A. You mean a timetable?

Q.   No, I just want to know what was the process, what were the documents that... how... was there a legal process, is there any agreement that was signed by Coquico. I want you to explain to me how that transfer of rights occurred.

A.   I won the case. I have a sentencing of three hundred and forty-eight thousand dollars. In order to collect, part of the things that happened was that Malik transferred every single asset that he owned to other family members trying to avoid paying me.

And, the only thing he had was the copyright and several things. So, we... as I recall... I mean my Attorney can give you better details on this. There was a sheriff's sale where we went and bid for it, for the process, and we won the bid for the copyrights.

Q.   Okay, I'm going to show you... along those lines... so your testimony is that you won or you acquired those rights to the copyrights following a public auction?

A.   I don't know if the term is "public auction", but it was part of the process of trying to collect the debt from the sentencing, from the sentencing that I had.

Q.   There's no... there was never an agreement by Coquico or a document signed?

A.   I don't recall. He wasn't very helpful in those terms. You know, he went and filed bankruptcy fraudulently, so you can imagine.

Page 50

District Judge, entered and Order for Execution of Judgement in this case dated September 19, 2011 (Docket No. 87) granting Plaintiff's Motion for Execution of Judgement, which read as follows:

ORDER

On July 27, 2011, a jury awarded $348,821.23 in favor of Angel Rodríguez-Miranda and against Coquico, Inc. (Docket No. 76).

Before this Court is now Plaintiff's Motion for Issuance of Writ of Execution on Jury Award in favor of Plaintiff. Since the Judgement is final, the Court grants Plaintiff's Motion for Issuance of Writ of Execution on Jury Award.

Accordingly, the Clerk of the Court is hereby ordered to issue Writs of Execution for Coquico, Inc., in the context of this case, with respect to the Judgement entered in favor of Plaintiff as follows:

Civil No. 10-1557(JAF)

1.    Against Defendant Coquico, Inc., in the amount of $348,821.23 for the jury award, plus legal interest accrued on that principal amount at the rate of .11% per annum in accordance with 28 U.S.C. 1961, from the date of the entry of Judgement until final satisfaction thereof.

IT IS SO ORDERED, JOSÉ ANTONIO FUSTÉ."

Q.    So, my question now is does that Order transfer you any

copyright?

A. No.

Q. Okay, it does not. And, that Order is dated... can you please state for the record the date of that Order?

A. San Juan, Puerto Rico, 19th day of September, 2011.

Q. Okay, great. And, then the Notice of Sale we already established that it was a notice informing that there was going to be an auction or a public sale?

A. Yes.

Q. So, is it correct that, of these documents that were included in the Complaint, there is no document, Court Order, which confirms that the transfer of the copyright actually occurred, and that you were transferred the property listed in page eleven of twelve?

A. (NO AUDIBLE RESPONSE FROM DEPONENT.)

Q. That's a very simple question. I'm asking about the documents that you have before you.

A. Page eleven of twelve?

Q. Yeah, I'm asking you if there's any document, a posted Notice of Sale, a Court Order or a Marshall Issued Order that confirms the transfer of this title to you?

A. Well, this is... the document I have here is a Notice of Sale. The document that you're asking I don't know if it's in the following documents here. There's just a Notice of Sale.

Q. So, among those documents that we've seen, there's no

Order following this Notice of Sale, correct?

A.    (NO AUDIBLE RESPONSE FROM DEPONENT.)

Q.    No. And, does such...

COURT REPORTER: He didn't answer.

A.    No.

BY MS. CASELLAS-CABRERA:

Q.    No. And, what about do you have... would have that Order or that record in your office confirming the transfer of these items here on page eleven of twelve to you, following the auction of sale?

A.    I... my Attorney should have it somewhere. I don't know.

Q.    So, you don't know. Is it possible that they don't exist?

A.    Well, at the end of the day, there's a Certificate of Recordation under my name. So, I guess that's the result of what we're looking for.

Q.    Okay, and you're referring to the Certificate of Recordation that's page two of twelve, correct?

A.    Yes.

Q.    So, your position is that this shows that the transfer took place? That's your position?

A.    Yes.

Q.    Fine, okay, thank you for that. And, again, you already stated that, following this auction, there was no agreement with

Coquico, no conversation on the assignment of transfer of the plush toys copyright?

A.    No.

Q.    Okay, and then, following... based on your Complaint, following this transfer of title that allegedly took place between the Court involving the Coquico copyright to your personally, correct?

A.    (NO AUDIBLE RESPONSE FROM DEPONENT.)

Q.    Then, you transferred those copyrights to the Plaintiff, WE, LLC. Is that correct?

A.    Yes.

Q.    Now, let's talk about that said assignment or that transfer of rights. When did that transfer take place?

A.    I don't have the exact date.

Q.    Do you know of a document that records or assigns those rights to Wild Encantos?

A.    I think there's a document.

Q.    There is a document?

A.    I don't have it with me right now.

Q.    I'm going to show it to you.

MS. CASELLAS-CABRERA: And, that is Exhibit 7.

COURT REPORTER: You're going to mark it as 7?

MS. CASELLAS-CABRERA: Yes.

(Whereupon,

the above-mentioned document was marked as Exhibit 7 to

the deposition.)

BY MS. CASELLAS-CABRERA:

Q.    Have you seen that document before?

A.    Yes.

Q.    Can you explain to me what it is?

A.    Angel Rodríguez-Miranda... this is a Copyright Assignment... has having an address of Calle Alcanfor, Toa Alta, Puerto Rico, hereinafter the Termed Owner, is the owner of original works of authorship fixed in a tangible medium of expression (hereinafter termed WORKS), namely the following materials:

A.    Coqui Común, Copyright Number VA0001075653.

B.    Coqui: We Sing, Copyright Numbers TX0005550274; TX0005535397.

C.    Musical plush toy frog named 'Común': A commissioned work for Coquico, Inc., by Michael Tian, Copyright Number V3473D525.

D.    Rufus/by Coquico, Inc., Copyright Number VA0001138519.

E.    Tata/by Coquico, Inc., Copyright Number...

Q.    Mr. Rodríguez, if you feel free, you can go ahead and read the entire thing. I'm just saying I just want an overview of what the document is. But, again, if you would feel better reading the entire thing, I have no issue with that.

A.    What do you...

Q.   I just want an explanation of what this document is?

A.   Okay, I'm going to... if I read it...

Q.   Yes, go ahead, go ahead. I just want to make sure.

A.   "1.  Owner does hereby sell, assign, transfer and convey unto ASSIGNEE the entire right, title and interest in and to said WORKS, and in and to any and all copyrights on said WORKS that may arise and/or may be granted in the United States and any foreign country, and including each and every derivative WORK arising from said WORKS anywhere around the WORLD.

2.   Owner does hereby covenant and agree to cooperate with ASSIGNEE whereby ASSIGNEE may enjoy to the fullest extent the right, title and interest herein conveyed. Such cooperation shall include:"

And, then it keeps just going on just to...

COURT REPORTER: Do you need time to review the document?

MS. CASELLAS-CABRERA: Sure.

BY MS. CASELLAS-CABRERA:

Q.   Do you want to go off the record a few minutes so you can examine the totality of the document?

A.   What do you need to know? What do you want?

Q.   A basic explanation of what it is.

A.   It's where I, as the owner of the copyright, assign WE, LLC the rights to produce and distribute and everything that

comes with owning the copyright, that they can sell and distribute.

Q. Great, thank you for that. Can you tell... can you state the date of that agreement?

A. 24, July, 2017.

Q. So, that took place about three years after the auction where you allegedly received the copyright?

A. Yes.

Q. Okay, and...

A. By the time I got the copyright, that was in... I was a member of the House of Representatives.

Q. And, what does that mean, that you couldn't hold the rights to the copyright?

A. No, I had the right. I was just... I was a full-time State Representative.

Q. So, what was the reason why you decided to transfer the copyright to this entity? Was there any business rationale?

A. So, the Court... it's legal advice... legal advice... so the corporation can sell and operate the manufacturing and distribution.

Q. Okay, and in 2014, when you allegedly received the rights to the copyright, was Wild Encantos in existence?

A. No.

Q. It came into existence sometime after. I think you said 2016, 2017?

Electronically signed by Rafael Vega-Quijano (601-267-767-2205)    7872cd50-c738-44f1-a2de-300a6194db9a

A.   Yes, uh huh.

Q.   I have a question that I wanted to ask you before, but I'm going to use the time to ask. Have you done any business with Defendants? Have you attempted to do business anytime involving the plush toys or any other product with the Defendants?

A.   Other than that?

Q.   Uh huh.

A.   No.

Q.   No. So, and my next question is, once this was executed and there was a transfer to WE, LLC, as you attest in this case, did you at any point submit this copyright assignment to the Copyright Office for recordation?

A.   I don't think so. I think it was just internal to me and the corporation.

Q.   So, as far as you know, it was an internal assignment. No recordation to the Copyright Office?

A.   As far as I know.

Q.   Mr. Rodríguez, I understand... I'm going to show you now the following document.

MS. CASELLAS-CABRERA: We'll be marking it as Exhibit 8.

(Whereupon,

the above-mentioned document was marked as Exhibit 8 to the deposition.)

BY MS. CASELLAS-CABRERA:

Q.   Is this document in any way familiar to you?

A.   Well, it's probably a post from 2022...

Q.   Okay, so...

A.   ... the Wild Encantos page.

MS. CASELLAS-CABRERA: So, for the record, he's referring to the document identified as 0066, CRV Supplemental Initial Disclosure.

BY MS. CASELLAS-CABRERA:

Q.   Do you recognize that this is a post from Wild Encantos's Facebook account? Would that be correct?

A.   Probably, yeah.

Q.   And, do you see that it shows that it was uploaded November 7th of 2022?

A.   Yes.

Q.   And, then the page following that is CRV Supplemental Initial Disclosure, document 0076, 0077, 0078, 0079, 0080 and 0081. Do you recognize those as well?

A.   Yes.

Q.   Is that... does that... do those images show Wild Encantos's Facebook Internet page?

A.   Yes, I think it's a Shopify account.

Q.   Oh, a Shopify account.

A.   I think the Facebook directs you to that, but I'm not the expert on that.

Q.   So, I'm going to specifically ask the questions on the first one, 0066 and the Facebook page. Looking at this, it seems

that you have a range or a variety of coquis that you sell. Is that correct?

A.   Uh huh, yes.

Q.   And, they have... it seems to me that they have different sizes.

A.   Yes.

Q.   And, they're not all identical. Is that correct? I see two. The one in the left corner and the one in the middle have a black line in the mouth, and both in the corner have nostrils. Is that correct?

A.   Uh huh, yes.

Q.   And, they're not the same size. Is that correct?

A.   No, they're different models...

Q.   They're different models.

A.   ... within the line.

Q.   And, the stitching on all those four coquis is not... it's not the same?

A.   No, when you have different sizes, the stitching is never going to be the same.

Q.   Right. And, the shape also is not the same on all of those?

A.   No.

Q.   And, the version... have you changed the versions of the coqui over time? How does that work? Do you decide... you have decided to change the model and launch a new coqui in a

different shape? How have your business decisions changed over time involving the coqui?

A.   Basically, the coquis are in the same pattern. We... sometimes where a designer says "What do you think of this?", and we'll try it on the market, and, if it works, it works.

Q.   Great. When you say "the same pattern", what do you mean by "pattern" specifically?

A.   Cream in the back, plastic eyeballs, Puerto Rican flag stitched to it, lighter cream color belly, the paws, the feet, the toes.

Q.   Great. But, then seeing that the paws of those images in 0066 are different.

A.   Yeah.

Q.   The one in the left corner does not have brown paws, neither the key chain, the small key chain, while the two...

A.   The small key chain is kind of tough to do it. That's all.

Q.   Right. So, the one in the middle and the right corner, those have a different set of colors.

A.   Yeah.

Q.   Have you... and I think I mentioned this before, but for the record to be clear... and you have not filed separate copyright registration for each of these models?

A.   No.

MS. CASELLAS-CABRERA: Okay, we already marked this...

Page 63

A.    The one owned by Coquico is on the left, the one on the right is mine.

Q.    Right. And, then can we go to the next page. And, again, the Coquico coqui would be the one on the left, and yours on the right?

A.    Yeah.

Q.    And, that is also page 0249. It looks like a side image of the coqui. Now, let's look at 0250. This is a top to bottom...

A.    Belly.

Q.    ... belly picture of the coqui. Is it correct to say that yours is on... Coquico's is on the left, and yours is on the right?

A.    Yes.

Q.    And, the same question for 0251. Yours is... the coqui that is showing on the left is Coquico's, and the right is yours?

A.    Yes.

Q.    And, I want you to... from those plush toys that I placed in front of you, can you identify which one is the Coquico plush?

A.    This one right here.

MS. CASELLAS-CABRERA: So, we're going to I.D. this as a Coquico plush.

COURT REPORTER: This would be Exhibit 10?

MS. CASELLAS-CABRERA: Yes.

(Whereupon,

the above-mentioned document was marked as Exhibit 10 to the deposition.)

BY MS. CASELLAS-CABRERA:

Q.    So, based on your previous testimony, it's that Coquico registered the Común Coqui, correct?

A.    Yes.

Q.    And, before the Copyright Office?

A.    (NO AUDIBLE RESPONSE FROM DEPONENT.)

Q.    And, based on the prior testimony, the prior document, we saw that the Coquico litigation involved the Plaintiff Coquico, who was alleging copyright infringement over this design here that we've identified as Exhibit 10?

A.    (NO AUDIBLE RESPONSE FROM DEPONENT.)

Q.    And, so... and that's a "yes"?

A.    Yes.

Q.    So, and this plush toy that I'm showing you, Exhibit 10, it has a particular shape, correct?

A.    Yes.

Q.    The head has a particular shape, it has a particular stitching pattern?

A.    Yes.

Q.    It has a distinctive position of the limbs?

A.    Yes.

Q.    And, it has a flag on the underbelly?

A.    Yes.

Q.    And, then a combination of kind of brown colors, correct?

A.    Darker cream on the top, lighter in the belly, and darker toes.

Q.    And, darker toes.

A.    And, a Puerto Rican stitched flag and plastic eyeballs and a handtag.

Q.    Right, and a handtag. And, the handtag reads "Coquico", correct?

A.    Yes.

Q.    Okay, now I'm going to ask you to compare. If we look at Exhibit 3, which is the coqui that you alleged in the Complaint, that you mentioned in the Complaint, that we... that Defendant infringed, and then the Coquico plush, which is the plush that was registered, would you agree with me that the head shape is different?

A.    Well, it's got raised... it's pretty much the same concept.

Q.    What do you mean?

A.    The same concept, raised eyeballs, darker cream, lighter cream in the belly, and darker toes, and a Puerto Rican flag stitched to it.

Q.    Darker toes, okay. So, that's fine. But, would you state that the heads are different, and that's a very straightforward question?

A.    Yeah.

Q.    And, the stitching pattern is not the same?

A.    Yeah.

Q.    And, the proportions of the limbs are also not the same?

A.    Yeah.

Q.    And, the posture of the toy is not the same?

A.    (NO AUDIBLE RESPONSE FROM DEPONENT.)

Q.    And, the...

COURT REPORTER: There was no answer.

A.    Yes.

COURT REPORTER: Thank you.

BY MS. CASELLAS-CABRERA:

Q.    And, the underbelly construction is also different?

A.    Well, both bellies have Puerto Rican flags stitched to it.

Q.    Right. But, if we look at the limbs in this position that we've placed them, they look different, correct?

A.    Yes.

Q.    And, the toes also, if we look at the amount of toes that they both have, they're also different?

A.    Yes, two, different models.

Q.    They're two, different models. And, we already established that there's no copyright application for this one by Wild Encantos?

A.   Everything, I guess, is covered in the... on the other one.

Q.   And, by "everything is covered on the other one", you are referring to the plastic eyeballs, the cream belly, the darker tone on the top, and the darker color in the feet?

A.   Uh huh.

Q.   Is that correct?

A.   Yes.

Q.   And, the flag?

A.   And, the Puerto Rican flag.

Q.   And, the Puerto Rican flag idea on the... is that correct... on the belly?

A.   Yes.

Q.   Do you remember, in that Coquico litigation we established earlier, that the Coquico litigation also involved the parrot?

A.   Yes.

Q.   And, you established earlier also that you believed that Wild Encantos believed or considered that the parrot toy is also registered and duly protected under the Copyright Office?

A.   Yes.

Q.   Are you aware of the Court's decision in the Coquico litigation involving the parrot? Do you remember the outcome?

A.   I don't recall exactly what it was.

Q.   So, I'll show you the following document.

Electronically signed by Rafael Vega-Quijano (601-267-767-2205)                    7872cd50-c738-44f1-a2de-300a6194db9a

MS. CASELLAS-CABRERA: And, this will be Exhibit 11.

(Whereupon,

the above-mentioned document was marked as Exhibit 11 to the deposition.)

BY MS. CASELLAS-CABRERA:

Q.   And, I'll ask you to go to page... I believe it's page twelve... page ten. I'm going to make... if you could please evaluate or read or review that first paragraph of page ten, along with the sentence that reads "In conclusion...".

A.   You mean the whole paragraph?

Q.   You don't have to read it out loud, just for you, in order to answer a few questions that I'll be making.

(BRIEF PAUSE)

(Revision of document by Deponent.)

COURT REPORTER: Let the record show that the Deponent is reading to himself.

MS. CASELLAS-CABRERA: Right, let the record show. Thank you.

A.   Okay.

BY MS. CASELLAS-CABRERA:

Q.   So, do you agree with me that the Court in this case did not make a ruling, a copyright infringement ruling, involving the parrot?

A.   Yes.

Q.   Yes. And, do you agree with me that the reason the

Court did not or state in this Order that it did not make a ruling is because there was no evidence of the copyright of the parrot copyright being registered?

A.    That's what it says.

Q.    That's what it says, okay. And, we agreed... established earlier that Coquico, who was the Plaintiff in this case, was the owner who registered... who allegedly registered the copyright?

A.    Yes.

Q.    But, you could not evidence about it's registration on the parrot. Is that correct?

A.    Yes.

MS. BECKER-WHITAKER: I'm sorry, did you say "you could not"?

MS. CASELLAS-CABRERA: Coquico could not.

MS. BECKER-WHITAKER: Exactly, okay.

BY MS. CASELLAS-CABRERA:

Q.    Okay, that will be all on that document. I'm going to show you...

MS. CASELLAS-CABRERA: Let's show him Exhibit 2, the Amended Complaint.

BY MS. CASELLAS-CABRERA:

Q.    You should have Exhibit 2. Please go to paragraph twenty-seven. And, it reads... it says... in paragraph twenty-seven, it says:

"The Puerto Rican parrots match the coloring of the bird in nature, with the notable exception of the beak, which is yellow on the plush toy, rather than white as in nature.".

A.   Yes.

Q.   Before I get into the rest of my question, would it be a fair representation to state that, during the design process with Coquico, you wanted to create kind of an accurate representation of the animal in the form of a plush toy?

A.   We wanted to make it as fun as possible. So, that's why the yellow beak is... represents a nicer combination with the...

Q.   You remember talking about this and choosing the colors, and being part of the selection process?

A.   Probably twenty years ago.

Q.   But, "yes", it was a discussion among the partners of Coquico?

A.   Yeah.

COURT REPORTER: Could you repeat that?

A.   Yes.

COURT REPORTER: Thank you.

BY MS. CASELLAS-CABRERA:

Q.   So, based on the allegation in that paragraph twenty-seven, the idea was for the coquis to match the actual colors of the frog in nature.

So, would you agree with me that the idea to have a

green body, sort of blue wings and...

A.   Are you talking about the parrot?

Q.   The parrot, yes.

A.   You said "coquis".

Q.   I'm sorry, I'm talking about the parrot right now. So, for the record to be clear, I'm going to start over again.

So, the idea was for the color combination to match that of nature, which included obviously choosing a green color...

A.   Uh huh, yes.

Q.   ... as a basis, then blue wings, sort of a black crest. And, then your position is that the yellow beak was sort of a creative decision?

A.   Well, the yellow beak, the white around the plastic eyes, the red monito.

Q.   So, those you believe were creative concepts?

A.   Well, it's part of what we created in the plush toy, plus the Puerto Rican flag on the belly. When you see items, they pretty much located the same patterns.

Q.   I'm going to show you next a document that has been identified as 0054 and 0055.

MS. CASELLAS-CABRERA: And, this will be Exhibit 12?

COURT REPORTER: Exhibit 12.

(Whereupon,

the above-mentioned document was marked as Exhibit 12

Q.   Do you have any reason to believe that this is not an accurate description of the Puerto Rican parrot?

A.   I don't think it's an accurate description because, if you look at the picture, the beak is not white... it's not yellow, it's white... it's bone white.

Q.   Right. But, the description says that it's "beak yellow/horn in color". Horn is also kind of a color combination or a yellowish/brown color.

A.   The description could say one thing, but the picture says the other thing.

Q.   Okay.

A.   I mean, the beak is white.

Q.   So, you believe that you have a reason to dispute the description by the World Parrot Trust?

A.   I believe the picture is contrary to the actual description in terms of the beak.

Q.   Okay, I can accept that. So, it's that the document does not reveal the description that has been quoted in the...

A.   I don't see a yellow beak on the picture.

Q.   But, it does say in the description that the animal has a beak yellow/horn in color. Is that correct?

A.   That's what the description says, but that's not what the picture reflects.

Q.   That's fine. So, according to Exhibit 12, the Puerto Rican parrot's body is green in color?

Electronically signed by Rafael Vega-Quijano (601-267-767-2205)                    7872cd50-c738-44f1-a2de-300a6194db9a

Page 74

A.    Yes.

Q.    And, according to the description in Exhibit 12, the wings also have blue feathering?

A.    Yes.

Q.    And, there's also, according to the...

A.    But, you can't see the blue feathering in the picture.

Q.    No, you cannot. Well, there's a bit of... I would challenge that, but fine, that's your opinion. But, it is included in the description, correct, the blue feathering?

A.    Yeah, that's what it says.

Q.    And, the description also says that the Puerto Rican parrot has red markings on its head?

A.    Yes.

Q.    And, although there is a disagreement, the Exhibit does mention in the description a yellowish or horn-colored beak?

A.    I disagree with that.

Q.    Yes, but it...

A.    The picture speaks for itself. It's white.

Q.    But, it reads as a yellow/horn beak in the description?

A.    But, it's not correct according to the same picture of their website.

Q.    Fine. So, overall, the same features or the majority of the features that you allege in your Complaint that Defendant's design copied... and that is the green body, the blue wings, the red crest... are also featured in the animal in nature?

Page 76

yellow beak, and the Puerto Rican flag stitched to it. It looks more like my plush than what looks like the parrot in nature. The parrot in nature does not have a Puerto Rican flag stitched on the belly.

Q.    That's fine. My question is...

A.    It doesn't have a yellow beak either.

Q.    My question is simple. The color green is present in the body of the animal in nature?

A.    Yes.

Q.    And, it also has blue wings, correct?

A.    Yes.

Q.    And, it also has a red crest?

A.    Blue feathers.

Q.    Blue feathers. And, it also has a red crest?

A.    Yes.

Q.    And, according to Exhibit 11... Exhibit 12, it also has eye rings white?

A.    Yes.

Q.    So, with the exception of the flag and the beak colored yellow, the rest of the colors are identical... are accurate or representative of the actual parrot in nature?

A.    I would say.

Q.    Let's talk about the placement of the flag. You've mentioned across the deposition that you believe that the idea of placing the flag on the belly of this plush toy is protectable,

more than one version of the coqui.

A.   Yes.

Q.   And, when were those... when you started Wild Encantos, you started selling one version. Can you take me through the modifications that you've done or the launch of the different versions of the coqui that you've made over time?

A.   We've launched... we started with four or five items. Then, we expanded to Sapo Concho, to the manatee. I know we have like nine items, I would say.

Q.   Fine. But, I'm referring specifically to the different types of coquis there. When you started in 2016, let's say when you started Wild Encantos, you were only selling one model?

A.   No, we were selling I would say three or four models.

Q.   So, at all times, you've sold more than one model of the coqui?

A.   Yeah.

Q.   So, you've been consistent with that over time?

A.   Yes.

Q.   Okay, and would you say that... so when Wild Encantos was... before Wild Encantos, you would sell these coquis under your name?

A.   No.

Q.   So, you started selling them and merchandising them when Wild Encantos was established?

A.   Yes.

Q.   So, if we ask you what was the first... the date when Wild Encantos first sold these coquis, you would have to say what, sometime in 2016?

A.   2017.

Q.   2017.

A.   Ah, well, after 2016.

Q.   Would you say early 2017?

A.   I would say late, middle, late.

Q.   And, what happened between 2014 and when you acquired the rights to the... allegedly acquired the rights to the plush toys in 2017? You just had the rights, but you were not actually doing business?

A.   I was a full-time State Representative.

Q.   So, there was no business being done...

A.   No.

Q.   ... with the plush toys?

A.   No.

Q.   Your allegation in the Complaint is that Defendant copied the protected elements of your plush toys.

What evidence do you have that Defendant had access to Wild Encantos's plush toys before creating their product?

A.   My products were on the market. They were at the airport.

Q.   And, why at the airport? Why is this so significant to you?

A.    Because it's where we have more point of sales in one smaller area. And, I mean thirteen million passengers go through the airport every year, so there's a huge chance that your client saw my plush toys at one of the fourteen convenience stores that the airport has.

Q.    And, all of those fourteen convenience stores sell the plush toys?

A.    Yes.

Q.    So, you say that that is your biggest retailer, your biggest client?

A.    Probably, yeah.

Q.    So, your assumption is that, since so many people visit the San Juan Airport, have been to the San Juan Airport...

A.    Uh huh, yeah.

Q.    ... so your assumption is that, since so many people visit the San Juan Airport, and the plush toys are for sale in all of the fourteen point of sale souvenir stores at the airport, then they should have come across them? That is your theory?

A.    Yes.

Q.    But, other than that, do you have any evidence showing that they knew or somehow they had access to those?

A.    No, I think... I mean they have to show the evidence how they created this the same way we created it back in... when we started. Mine was already on the market before their's was.

Q.    But, you're aware you're the Plaintiff, and the

A.    What page are you at and what Exhibit?

Q.    I'm on page seven.

A.    Exhibit what?

Q.    Exhibit A, page seven. They run consecutively... the numbers.

A.    Exhibit 1, this one?

Q.    Yes, go to page seven. I'm referring to Exhibit 1, page seven. If we go to the Topics for Examination, the first area that you said you could testify on was Wild Encantos's Pleadings and Claims against Defendants. You said you could testify on those.

And, you also said that... if you look at fourteen, it says:

"All trade dress elements Plaintiff contends it owns in Plaintiff's Toy Coqui and Plaintiff's Toy Parrot..."

A.    Where are you... which...

Q.    I'm reading from Topics for Examination, one, and then I'm referring to fourteen, fifteen, sixteen, seventeen, eighteen, nineteen. All of those areas of examination deal with language and allegations that you made in the Complaint on behalf of Wild Encantos.

A.    Uh huh, yes.

Q.    And, I'm asking if you believe that you have a trademark? As the corporate representative, you should know the rights that you have. Do you allegedly have copyrights, do you

have trademark rights over the plush toys coqui and parrot?

A.    Well, technically the trademark belongs to Wild Encantos, the brand.

Q.    So, you don't have trademark on the design of the plush toys. Would you agree with me on that?

A.    I own a copyright, and I believe trademark was for Coquico.

Q.    For the brand?

A.    For the brand Coquico.

Q.    For the nominal part of Coquico?

A.    That's what I understand.

Q.    Okay, fine. So, you would agree with me that there's really no trademark involved here involving the design or the packaging of this coqui...

MS. BECKER-WHITAKER: This has been asked and answered and asked and answered. It's a legal issue, and he said "I believe we don't have a trademark. I don't know.". I mean you can ask him sixteen times. It's your deposition, but it has been asked and answered.

MS. CASELLAS-CABRERA: Thank you. I just want a clear answer.

BY MS. CASELLAS-CABRERA:

Q.    So, the response is "no", you're not claiming a trademark issue her?

MS. BECKER-WHITAKER: Objection. That's a

plush toys.

Q.    Okay, thank you, thank you. Let's turn our attention to paragraph sixty-six of the Complaint, and I'm referring to Exhibit 2 again... sixty-seven. It reads:

"The unauthorized plush toys and related merchandise, which have been distributed and sold by the Defendants, duplicate and appropriate the likeness of the Plaintiff's copyrighted properties in order to delude and confuse the public into believing that the plush toys and related merchandise have been authorized and/or sponsored by the Plaintiff.".

Do you read that in paragraph sixty-seven, page twelve? And, this is the Amended Complaint, Exhibit 2.

A.    Yes, yes.

Q.    Okay, so what is your basis for that? What... did any customer ever report to you buying Defendants' plush toys believing that they were Wild Encantos's?

A.    They told me that people that saw it in Always 99 they called and they said "Listen, I think somebody copied you.".

Q.    And, who was that? Who said that?

A.    Just people that know this is my business.

Q.    And, by "people", do you refer to colleagues, to people who are in the chain or the business of distribution?

A.    People that went to buy the coquis and to buy something I guess at Always 99, and they realized the coqui (phonetic), and

they called me, several people, relatives that know me, people that know this is my business.

Q. Can you name them?

A. I can name Carlos Padilla, Obed Rojas...

COURT REPORTER: Who?

A. ... Obed Rojas. Those two, I remember them.

BY MS. CASELLAS-CABRERA:

Q. And, when was that? Can you pinpoint the specific time?

A. Somewhere in-between 2022, 2023.

Q. And, when people saw the plush toys, they were fri... they saw Defendants', Caribbean Retail Ventures plush toys?

A. Yeah, yeah.

Q. So, they were referring specifically to those, correct?

A. Yeah, they... I remember that they called and said... they asked me if I was selling at Always 99, and I was like "Those are not mine.".

Q. Did you ever record or memorialize, in any sort of way, this conversation or this call or information that you got?

A. No, because, after that, I went and visited some other stores and realized that it was happening.

Q. And, so I'm going to show you now a set of documents. I'm going to show you Defendants' Request for Production... strike that. I'm going to show you Caribbean Retail Ventures Interrogatories and Request for Production of Documents, along with your Answers to those Interrogatories and Request for

less than that?

A.    Stable. They... I mean, when I say they go up and down, it's not something significant. We have a steady in the tourist market. It just depends on the tourist market and how the tourists respond (phonetic).

Q.    Did you have a good year in 2025 with the residents?

A.    Yes.

Q.    In comparison with the year prior?

A.    Yes.

Q.    What about retail price for the plush toys, do they sell at the same price point... the coqui and the parrot?

A.    Mine?

Q.    Yours, yours, I'm asking for yours, yes.

A.    There are a couple... I guess a dollar or two in terms of retail. It depends. I mean it depends on the client. Some clients have fifty a percent margin, some clients have a two hundred and fifty percent margin on the sale.

But, I sell the items at wholesale at the same price to everyone. The retail just changes.

Q.    So, retail, give me an average sale?

A.    Twelve to fifteen dollars.

Q.    Twelve to fifteen, okay. And, what about a wholesale price?

A.    I'd say fifty percent of that.

Q.    Do you know the price point at which Defendants' plush

Page 97

toys sold?

A.    Yeah, they sell it like for four-ninety-nine or something like that.

Q.    Would you agree that there's a significant difference between twelve to fifteen and four-ninety-nine?

A.    It's a cheaper version, and it... four-ninety-nine is very cheap.

Q.    Who's your consumer? The tourist, but just the general tourist? Any specific market that kind of address?

A.    Toys, souvenirs, gifts, that type of market.

Q.    Do you know the consumer of Always 99, the typical consumer of Always 99? Do you know the Dollar Store to a Value consumer?

A.    No.

Q.    Has the retail price... since 2020... and considering the tariffs and the changes in the market... has the retail price shifted significantly or would you say that it's stayed between the twelve and fifteen?

A.    I can't tell you about retail because I'm not involved in retail.

Q.    Right, right.

A.    The only retail I do is on the website.

Q.    Okay, so wholesale, that you control the wholesale?

A.    Wholesale, tariffs has hit us hard. We've had to... more than tariffs. During the pandemic, we had issues with the

Page 103

A.    They just stopped ordering.

Q.    They just stopped ordering. So, none of them sent you an e-mail perhaps explaining like "We're not going to buy for this and that reason."? You don't have such communication?

A.    No, no.

Q.    Are you aware that Always 99 only sells their products endorsed in their stores?

A.    I believe so. I'm not...

Q.    You don't have any... but you don't have any reason to disbelieve that?

A.    No.

Q.    I'm going to be asking for evidence or for... as well as... well, I'm going to ask for the sales, which I've done before, evidence of sales.

But, I also want the evidence of this shift of clients, any written document that you have in a spreadsheet, any document that attests that, during the years 2023 and 2024, you lost the number of clients that we just discussed.

Do you have any other information or any... what else do you have, any factual basis, document, that would justify that you had decrease in... that you lost sales because of Defendants' sales of the plush toys in the stores. Other than the reasons that we just discussed, is there any other document, any other foundation that you have for that to justify it?

A.    Whenever I lose a client, I try to get a new one. So,

Electronically signed by Rafael Vega-Quijano (601-267-767-2205)                                    7872cd50-c738-44f1-a2de-300a6194db9a

Q.    Do you do any trade... I don't know... do you appear in any specific shows?

A.    No.

Q.    No. So, social media. And, by "social media", you're referring to uploading a post?

A.    Uploading the post, and trying to direct as many people as we can to our website so we can sell online.

Q.    And, I asked about this before, but usually your main platform is Facebook?

A.    Facebook. I hire people for that.

Q.    How much do you invest annually in advertising?

A.    I don't know, from six to ten thousand.

Q.    And, that, again, comprises social media. Annually, so you say about six to ten thousand. And, this is basically for what we talked about, which is kind of managing the social media account and uploading, no advertising firm?

A.    Like I said I'm a one man show.

Q.    And, that six to ten has been consistent would you say throughout the years?

A.    Well, I mean I'm starting to try and grow that.

Q.    So, back in 2017, probably you invested...the investment was minimal?

A.    Yeah.

Q.    So, do you... can you pinpoint to a time period where your business really took off? Would you say that was after the

Page 117

CERTIFICATE OF REPORTER

I, RAFAEL A. VEGA-QUIJANO, Court Reporter and a member of Vega Reportage;

DO HEREBY CERTIFY: That the foregoing transcript is a full, true and correct record of the testimony given which was taken down by me and thereafter reduced to the typewritten form under my direction and supervision.

I FURTHER CERTIFY: That I am not in any way involved or interested in the outcome of said action.

WITNESS my hand this 23rd day of December 2025, in San Juan, Puerto Rico.

_____

RAFAEL A. VEGA-QUIJANO

Court Reporter