Exhibit 3

Page 120

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO


WE, LLC, d/b/a WILD ENCANTOS,          :

    Plaintiff,                         : CIVIL NO.: 3:24-cv-01185(CVR)

vs                                     : RE: COPYRIGHT INFRINGEMENT

CARIBBEAN RETAIL VENTURES, INC., :

SALOMON ABADI, Jane Doe, and           :

their conjugal partnership,            :

JOEL BENDER, Susan Roe, and            :

their conjugal partnership,            :

    Defendant(s)                       :

-----------------------------------


CONTINUATION OF THE TAKING OF THE DEPOSITION OF:

ANGEL RODRÍGUEZ-MIRANDA


DATE      :    February 5, 2026

TIME      :    10:00 A.M.

PLACE     :    Adsuar, Muniz, Goyco, Seda & Pérez-Ochoa, PSC

               Banco Popular Building, 16th Floor

               Munoz Rivera Avenue, Puerto Rico, 00918

Page 121

A P P E A R A N C E S

FOR DEFENDANTS:    ALEXANDRA CASELLAS-CABRERA, ESQ.

Adsuar, Muniz, Goyco, Seda & Pérez-Ochoa, PSC

Banco Popular Building, 16th Floor

Munoz Rivera Avenue, Puerto Rico, 00918

LUIS PÉREZ-GIUSTI, ESQ.

(Via Internet)

FOR PLAINTIFFS:    JANE BECKER-WHITAKER, ESQ.

P.O. BOX 9023994

San Juan, Puerto Rico 0962

DEPONENT:    MR. ANGEL RODRÍGUEZ-MIRANDA

NOTARY PUBLIC:    OSVALDO GOTAY-CASTRO, ESQ.

COURT REPORTER:    MR. RAFAEL A. VEGA-QUIJANO

Vega Reportage

I N D E X

ANGEL RODRÍGUEZ-MIRANDA

DIRECT EXAMINATION (Cont.):

By Casellas-Cabrera, Esq.:                               124

EXHIBITS:

None.

Electronically signed by Rafael Vega-Quijano (601-267-767-2205)          6aadf14f-537b-4633-b980-d4bc6e8f4896

P R O C E E D I N G S

(10:12 A.M.)

COURT REPORTER: We're on the record.

MS. CASELLAS-CABRERA: We're on the record. So, today is February 5, 2026. We're here for the continuation of the deposition of Angel Rodríguez-Miranda, the corporate representative of Plaintiff WE, LLC.

My name is Alexandra Casellas. I represent Defendants in this case. Today's questioning will continue under the same oath and under the same stipulations and obligations as the previous session, and that applies for the Court Reporter as well... the oath.

So, again, instructions and stipulations remain the same. So, let's go through the room just to introduce ourselves for the record. My name again is Alexandra Casellas. I'm Counsel for Defendants.

DEPONENT: Angel Rodríguez-Miranda, Angel Edgardo Rodríguez-Miranda.

MS. BECKER-WHITAKER: Jane Becker-Whitaker, Counsel for Plaintiffs.

COURT REPORTER: Rafael Vega...

MR. PÉREZ-GIUSTI: Luis Pérez-Giusti, virtually, Counsel for the Defendants.

COURT REPORTER: Rafael Vega-Quijano, Court Reporter.

MS. CASELLAS-CABRERA: Perfect.

(Whereupon,

MR. RAFAEL A. VEGA-QUIJANO

having been previously duly sworn, acted as the official Court Reporter of the proceedings held during the act of taking of deposition.)

(Whereupon,

MR. ANGEL RODRÍGUE-MIRANDA

having been previously duly sworn, was examined, and testified upon his oath as follows:)

DIRECT EXAMINATION (Cont.)

BY MS. CASELLAS-CABRERA:

Q.   So, Mr. Rodríguez, you are the corporate representative of WE, LLC?

A.   Yes.

Q.   And, you're here to testify about the copyright...

MR. PÉREZ-GIUSTI: Alexandra, may I interrupt for one second?

MS. CASELLAS-CABRERA: Of course, yes, you may.

MR. PÉREZ-GIUSTI: Sorry. I'm not sure if it was Rafa in the first part of the deposition or if it was another Court Reporter.

MS. CASELLAS-CABRERA: Yes, he was in the first part, yes.

MR. PÉREZ-GIUSTI: Okay, okay. So, he's under the same oath?

MS. CASELLAS-CABRERA: Yes.

MR. PÉREZ-GIUSTI: Okay, perfect. Sorry.

BY MS. CASELLAS-CABRERA:

Q. So, and you're here to testify about the copyright and other rights claimed in this case, correct?

A. Yes.

Q. So, the works that you claim were infringed... I think we talk about last time... are those that are shown in the Complaint. I'll show you... I'm showing you what we marked as Exhibit 2. If you can take a look at the images of the works you allege were infringed.

A. Uh huh, yes.

Q. Yes. And, so can you state for the record whether that is a photo of Exhibit 3, which I'm showing you right now? Is that the same coqui?

A. Yes.

Q. And, I'm showing you also... in that Exhibit 2 which is the Complaint, it has some pictures on it, correct?

A. Yes.

Q. Of a parrot?

A. Yes.

Q. So, I'm showing you Exhibit 5. Can you state for the record whether that is an accurate picture of the same parrot that is shown in the Complaint?

A. Yes.

Electronically signed by Rafael Vega-Quijano (601-267-767-2205)

Page 126

Q.   And, those are plush toys from your company. Is that correct?

A.   Yes.

Q.   I believe we established last time that neither you personally or Wild Encantos never actually filed a copyright application before the U.S. Copyright Office for those two designs. Is that correct?

A.   I own the copyrights for both of them, but Wild Encantos did not do the filing.

Q.   Okay, and did you do... you, personally, did you do the filing before the Copyright Office?

A.   No, it wasn't part of my responsibilities.

Q.   So, based on your statement right now that you said that you owned the copyright, I think, after the last session, we requested a Copyright Registration Certificate showing that your copyrights or what you allege are your copyrights are duly registered within the Copyright Office. Do you remember that?

A.   Well, yes.

Q.   And, you said last time that those documents, those Registration Certificates, would be in a file in your office.

A.   Well, yeah, in my Attorneys'.

Q.   What do you mean by your "Attorneys'"?

A.   Well, either my Attorneys have it or I have them in my office. But, it's public documents.

Q.   Where are they public?

Electronically signed by Rafael Vega-Quijano (601-267-767-2205)    6aadf14f-537b-4633-b980-d4bc6e8f4896

Page 127

A.    U.S. Copyright Office.

Q.    And, are you aware that we have requested a copy of those Copyright Certificates in this case?

A.    I think we... didn't we see them last time?

Q.    I think last time we established that there are no documents aside from... that there is a Certificate of Registration from the Copyright Office.

A.    Didn't we go over the copyright documents?

Q.    You might be referring to Exhibit 6.

MS. CASELLAS-CABRERA:  I'm showing... I'm going to show the Deponent Exhibit 6.

BY MS. CASELLAS-CABRERA:

Q.    And, I'm specifically referring to the Exhibit within that Exhibit 6.

Let me know if you're referring to those documents as the evidence of registration of your copyright?

(BRIEF PAUSE)

(Revision of document by Deponent.)

A.    Yes, this looks familiar.

BY MS. CASELLAS-CABRERA:

Q.    But, those are the... do you have any other documents within your office or your files other than those that are included there?

A.    It's pretty much the same file, but I might have a document that's additional to this, but I know it's the parrot

Page 128

and the frogs that are registered.

Q. Okay, but that's...

A. And, this is the transaction, I guess, when it was turned over to me.

Q. Fine. My question is simple. Within that package of documents, is there any document that states that there is a Certificate of Registration? Quite simple, "yes" or "no"?

A. It's a Certificate of Recordation.

Q. Recordation. So, again, no Certificate of Registration within that package? It's a simple "yes" or "no" answer.

A. No, I don't see it.

Q. So, you say that there might be another document in your office.

Are you well aware that we requested specifically the files in your office following our deposition regarding any registration within the Copyright Office?

Q. I will have to go over the documents I have, but it's there. I mean I have the Copyright Registration.

A. Okay, but it's not evidenced anywhere in those documents, correct? It's not documented here?

A. It's not... I... what... there's a Certificate of Recordation.

Q. Recordation. Which is not the same as a Certificate of Registration. Do you agree with me?

A. I don't see a document entitled Certificate of

Electronically signed by Rafael Vega-Quijano (601-267-767-2205)

Page 129

Registration.

Q.   Okay, great. So, sitting here today you cannot produce a Certificate of Registration for any of the plush toys that you allege in the Complaint that were infringed?

A.   If those... I believe there are public documents. They're in the U.S. Copyright Office.

Q.   Okay, but you have not produced them, correct?

A.   Not here.

Q.   So, let's move to paragraph... well, let me strike that. Before, we talked about... the last time, we talked about that you acquired certain rights in the... or I guess this is what you allege in the Complaint... that you acquired rights to a Coquico design plush toy. The plush toys were originally made by Coquico, correct?

A.   Uh huh.

Q.   And, you... but the Complaint includes a different model from the Coquico design that was originally sold and created. Is that correct?

A.   It's a... the original design, it's a frog with darker toes, lighter-colored belly, darker-colored belly... ah, darker-colored body, plastic eyeballs. It makes a sound. It has a sound chip, and it has a Puerto Rican flag stitched to the plush toy.

Q.   I'm showing you Exhibit 10, and please let me know if that is an accurate representation or photo of the Coquico plush toy?

COURT REPORTER: Okay, we'll be off the record.

MS. CASELLAS-CABRERA: I think that will be easier.

(OFF THE RECORD)

(BRIEF PAUSE)

(BACK ON THE RECORD)

COURT REPORTER: We're on the record.

BY MS. CASELLAS-CABRERA:

Q.    Yes, I'm showing you again what we've labeled as Exhibit 10, and I'm showing you again what was labeled as Exhibit 3.

And, I want you to specifically... let's talk about the stitching pattern. Can you frankly... and you're under oath... state whether both of the plush toys have the same stitching pattern?

A.    In some parts, they have the same. For example, when you look at the eyeballs, they have a similar stitching pattern. When you look at the back, I mean they're different sizes.

So, if you see they have similar stitching patterns on the back, en el lomo, if you want to say that. In the belly, it has a different stitching pattern, but it's pretty much the same concept and color in terms of the flag and the placement of the flag. That's the similarities.

Q.    What about the feet, are the feet identical? And, I want you to...

A.    No.

Page 132

Q.    No, they're different.

A.    No, no, I mean they are... in terms of pattern, they are a darker color brown in both. But, this model has five toes, four in the front, and the other one has three toes.

Q.    What about the nostrils, I feel that one has a different...

A.    Yes, one has a little highlight stitching. It's a larger plush toy, so it's a different model under the same concept.

Q.    So, you would agree with me two things, a different model, correct?

A.    Well, they're different but similar at the same time.

Q.    Okay, different models. And, they're also different in size?

A.    Yes.

Q.    And, do they share the same size toes?

A.    No.

Q.    So, I'm going to show you again... and I think you have it... the Complaint. Can you take a look at paragraph twenty-nine.

In paragraph twenty-nine, it references the 1st District Court's decision of the Coquico/Miranda case.

A.    Uh huh.

Q.    So, is it correct that, in that case, the Coquico... this Coquico case plush toy, which is Exhibit 10, that was the

Coquico plush toy that was in controversy there? Is that correct?

A. Yes.

Q. And, the Court in that case analyzed whether your specific produce infringed the copyright of the Coquico, again Exhibit 10. Is that correct?

A. Yes, specifically it says the color combination is protectable.

Q. And, so paragraph thirty says that the Court concluded that the stitching pattern was protectable, correct?

A. Yes.

Q. Now, looking at my client... and I'm showing you what was marked as Exhibit 16... is the stitching pattern in both the Coquico Exhibit 10 and Exhibit 16 the same?

A. If you ask me about the eyes, it's pretty...

Q. Is it the same?

A. ... similar.

Q. Is the stitching...

A. The eyes are similar. You're asking about the stitching. There's stitching in the eyes. There's a Puerto Rican flag on the plush toy as well, and there's plastic eyeballs.

Q. You're not being responsive. I'm asking about the stitching pattern in both designs. Are they the same?

A. In some parts, they're similar, but they're not the same, they're not the same.

Q. Name one part that they're similar?

Page 134

A.   Well, the plastic eyeballs.

Q.   Can you name any other similarities in stitching?

A.   The stitching of the Puerto Rican flag. It's got a stitching on the Puerto Rican flag.

Q.   Can you name any other?

A.   Different colored toes.

Q.   I'm not asking about the colors. I'm asking about the stitching.

A.   Well, in the stitching, it says color combination is protected.

Q.   Right. But, I'm asking you about paragraph thirty. And, paragraph thirty...

A.   Okay, I'm talking about paragraph thirty-two.

Q.   ... is about stitching pattern. Okay, just bear with me.

A.   Okay.

Q.   So, I'm talking about the stitching pattern. And, I'm asking you whether my client's Exhibit 16 is similar to the Coquico 1st District Court decision? And, we're focusing on the stitching pattern.

And, you said that it's similar in the eyes and in the flag which is stitched to the body of the plush toy. Any other similarities in stitching pattern?

A.   No.

Q.   Now, the color combination. In paragraph thirty-two,

the Court says that there's... that the color combination is protectable.

A.    Uh huh.

Q.    My question is simple. Do these two models share the same color?

A.    Color combination, yes.

Q.    So, your testimony here is that the Coquico... the tone... the brown tone in the Coquico plush toy is the same as our client's?

A.    I am saying they're the same color combinations. It's what it says in paragraph thirteen. I'm bearing with you. So, it's a lot darker cream-color in the body, lighter belly, and a darker brown in the toes, and the Puerto Rico flag. That's the color combination, pattern of the color combination.

Q.    Let's talk about...

A.    That was never... had never been done before until we did it.

Q.    And, can you explain a little bit more about that? So, you're saying... your statement is that, before Coquico, there was never a cream-colored coqui plush toy?

A.    With a Puerto Rico flag on it?

Q.    With a Puerto Rico flag.

A.    Not that was... that's why we got the copyright.

Q.    And, your meaning... what is... what do you mean by "cream"? Everything that goes from brown to beige you categorize

it as cream?

A. Well, it's a cream color... crema... light brown, cream. When it says "color combination", it's lighter in the belly, darker in the body, whatever gama... how do you say gama...

MS. BECKER-WHITAKER: Gamut.

A. ... gamut of colors that would decide, and darker toes.

BY MS. CASELLAS-CABRERA:

Q. And, let's now turn onto paragraph thirty-four and thirty-five. It says that the toes are protectable.

A. Uh huh.

Q. Is that Coquico toes identical to our client's?

A. Not that one.

Q. And, in paragraph thirty-seven of the Complaint, it says that Defendant moved the flag. So, you agree with me that the placement in both plush toy is not the same? It's simple. The placement is not the same, "yes" or "no"?

A. That's what people do when they copy. They change it a little bit. It's in the back, but it's a frog with a Puerto Rico flag stitched to it.

Q. Okay, but, again, my question is fairly simple. It is not placed in the same, identical location.

Mr. Rodríguez, do you believe that the mere fact that it has... that a coqui plush toy which shares a lighter belly, darker upper body, with the flag on the belly, would you say that

Page 137

you believe that that is protectable, and that you own the copyrights to that?

A.    Yes, of the color combination.

Q.    So, what about the dimensions? Paragraph thirty-eight of the Complaint says the coquis dimensions were protectable. Are they similar in dimensions?

A.    They're similar to the other one.

Q.    But, I'm not asking... I'm asking about the 1st District Court, which is the one that you're referring to in your Complaint, and I want to know the dimensions of the coqui plush toy, if Coquico plush toys are the same as our client?

A.    Not to this one, but to the other one.

Q.    Deponent, please answer my question. I'm asking a very straightforward question.

A.    Well, I own this copyright, and I own also that plush toy that was copied. That's... I mean I don't why it's so hard for you to understand.

Q.    This is not my question. You are making a series of allegations saying that the 1st District Court concluded that certain elements in that plush toy were protectable. So, I want...

A.    Specifically the color combination part.

Q.    Fine. But, I'm asking if the dimensions of that Coquico, which was part of the 1st Circuit Court decision, is identical to our client's?

Electronically signed by Rafael Vega-Quijano (601-267-767-2205)          6aadf14f-537b-4633-b980-d4bc6e8f4896

Page 138

A.    Identical it's not.

Q.    So, last time we established that the original design, Exhibit 10 and Exhibit 5, were created by Coquico. Originally, they were designed and created by Coquico, right?

A.    Uh huh.

Q.    But, in this lawsuit, you claim that you own the copyright, as you've stated multiple times, correct?

A.    Yeah, I believe it's called "Tata".

Q.    But, you testified back in December that there's no signed agreement from Coquico assigning the copyrights to you. There's no contract between Coquico giving you or assigning you the rights to those models.

A.    I bought them in Federal auction.

Q.    Okay, you bought them in Federal auction.

A.    That's how we solved the Judgement (phonetic).

Q.    Right. And, you testified back in December that the documents that you have on that purchase are the ones that you provided and submitted as part of your Discovery.

And, I'm showing you Exhibit 6 again, and I want you to corroborate whether those documents are the ones that you're referring to that include or evidence the transfer of the copyrights to you?

(BRIEF PAUSE)

(Revision of document by Deponent.)

A.    This is a document that lists all of the... when...

Page 140

can search for it in the U.S. Copyright Office.

Q.    Right. But, that doesn't mean that you don't have an independent duty to produce documents when requested. You're the Plaintiff.

A.    Well, I might have them, I might have them. I have to check my files. But, I mean what you're asking is something that you can go into the Copyright Office and get them.

Q.    No, I'm not, no. Deponent, contractual documents and communications related to the transfer of rights, they're not public documents.

A.    It's a... we're talking about a copyright that is registered in the U.S. Copyright Office.

Q.    My question is very simple. I've asked multiple times, and we've requested all contractual documents and communication related to the transfer of rights.

       I just want to know if what you've produced in this case is all that you have or are there additional documents that you've yet to produce in this case on the transfer of rights?

A.    I think the Notice of Sale is the document (phonetic). It makes reference to public records, but it's a document we have.

Q.    Thank you. So, last time... I think last time and today we've talked about what you believe is your copyright, which is kind of the combination of elements. And, we've talked about the cream back, the lighter belly, the darker toes, the plastic

Page 141

eyeballs, the flag stitched and the handtag, I think you mentioned last time.

So, it is your understanding that you have copyrights on the combination of those elements?

A.   Uh huh.

COURT REPORTER: You have to verbalize your answer.

A.   Yes.

COURT REPORTER: Thank you.

BY MS. CASELLAS-CABRERA:

Q.   What about the parrot? Can you provide every element that you claim is protected by copyright?

A.   When we designed the parrot, we were the first ones to come up with a plush Puerto Rican parrot with white... with yellow beak and yellow feet, the red crown on top, the white border on the plastic eyeballs, a Puerto Rican flag stitched to the belly of it, blue on the bottom part of the feathers, and that's about it.

Q.   So, that's the combination that you allege is protected, correct?

A.   Uh huh, that's the combination we came up with, being the first ones that did it.

Q.   Is the decision to use a green body, blue in the wings, a red crest, a decision that is also based on the fact that the real animal has this combination of colors?

A.   Yeah, we want to create a character that looks like it.

Page 142

Q. Right. So, it is fair to say...

A. With different fun elements that will... that's why we created the yellow beak and the yellow feet.

Q. Right. But, is it fair to say that you intended that the plush toy's end result would match somehow the Puerto Rican parrot?

A. Uh huh.

COURT REPORTER: You need to verbalize.

A. Yes.

BY MS. CASELLAS-CABRERA:

Q. If you had made the body of the parrot or of the coqui purple, would it be fair to say that it wouldn't be recognized as a coqui or as a parrot?

A. No.

Q. And, is it fair to say that the idea of placing the flag was to identify that is was a Puerto Rican souvenir?

A. Yes.

Q. And, what about the handtag, is it fair to say that it's there as kind of a purpose of branding, of providing care instructions, and perhaps other information related to the product?

A. Just information about the animal.

Q. So, it does have... it has kind of a brochure with information about the animal?

A. Just a regular handtag, one sheet... I mean I guess one

Page 143

sheet on both sides.

Q.    And, it does have... I'm looking at, and it does have... if you take a look at... I'm showing you Exhibit 3. It does have the handtag. It does have like a little story.

A.    This is not the parrot. This is the...

Q.    Ah, yes, okay. The parrot does not have the same... okay, I'm showing you both. I'm showing you Exhibit 10 and Exhibit 5. I'm seeing that the handtags have like a little story.

A.    Yeah.

Q.    And, what is this?

A.    You want me to read it?

Q.    No, no, no, I'm just asking what was this. I've never read it. This is the first time. It's like a little like story background.

A.    Yeah, they are just talking about the species, the animal itself. I can read it to you.

Q.    No, no, it's fine. And, do all your products carry this kind of the same idea of having a handtag with a little story about the animal?

A.    Yeah, all of them have a handtag.

Q.    So, let's talk about the plastic eyes. I think you mentioned that as compliment (phonetic) of your plush toys.

The plastic eyes in plush toys, would you say they're a standard compliment in the toy industry?

A.    Some of them have them, some of them don't.

Q.   So, not all plush toys would have plastic... not all plush toy animals would have plastic eyes?

A.   No.

Q.   No. What would they have?

A.   Stitched.

Q.   So, to understand, you're claiming that the decision to use the plastic eyes is also a protectable element of your...

A.   Well, it's part of the combination that we created.

Q.   I think last time you mentioned that... and I think we went a little bit before on this... but, before Coquico, all the coquis were green, and you included a cream... your contribution was kind of changing from the green and going into this cream-colored pallet.

A.   Uh huh.

Q.   And, so, before the coqui, beyond that change in the color green, what other elements did you introduce with your design that were different from the real animal and from what was in the market?

A.   Well, the whole concept of the combination of having a brown frog with a clear belly, a Puerto Rican flag stitched to it and darker toes made it more accurate.

Before, what was in the market it was just a regular green frog with a jacket or a shirt that said "Puerto Rico". That was the only... and we saw an opportunity, and we created this whole line of plush toys, characters, that resemble.

Page 152

you keep track of the lost clients? When you lose clients, do you have a record that you keep track of how your...

A.    If I lose a client, I try to get a new one.

Q.    And, on that note, I think that you mentioned that you've been successful enough to keep sales stable. And, when you lose a client, you find somebody to replace them. Is that correct?

A.    Yes.

Q.    So, if you're replacing...

A.    It's called "hustle".

Q.    So, if you're replacing lost sales with new sales, how have you suffered financial loss?

A.    Well, when... in copyright infringement, when Louis Vuitton seeks... goes after the fake bags that are out there, the sales are not what matter or the losses are not what matter. What matters is that a copyright was violated because someone copied your product, with a little bit of similar differences (sic), but the copied it.

Q.    But, in the Complaint, which is under oath, it says that you lost sales. So, my question to you is what was your financial loss?

A.    Well, the thing is they buy that coqui, so it's a coqui that they won't buy from me. So, I mean it's just...

Q.    You're saying that Walgreens will buy my client's coqui?

A.   No, but the client that buys the Walgreens, because Walgreens... for example... and I don't want to get Walgreens into this... but the client that goes to Walgreens is pretty much the same client that goes to Always 99. So, if they find a cheaper version of a similar product, more likely they will go to Always 99 instead of Walgreens.

Q.   Any other clients, other than Walgreens, that you lost?

A.   If I lose a client, my efforts go into finding someone that can substitute those sales.

Q.   So, would it be fair to say that financial loss has not been significant in this case?

A.   I work very, very hard to keep my business alive. This case is because your client copied our idea. What I do to keep my business running is pretty much my strategy. It doesn't... I mean my... the success of my business cannot depend on someone else. It's got to depend on me.

Q.   Thank you for that, but again that's not responsive. I'm asking about financial loss. Would you say that your financial loss are hopped on due to activities that you have implemented. Financial loses due to our client's activities does not...

A.   This is not about financial losses. It's about copyright infringement.

Q.   Do you have any...

A.   There's some statutory damages that are involved in

this matter because of violating a copyright.

Q.    So, for statutory damages, you need to have a Certificate of Registration as evidence that the copyrights are registered and we've established that there's none here. So, if you don't have statutory damages, then you need to prove actual damages. And, I want to know what is your financial loss?

A.    Well, we'll see.

Q.    So, evidence of financial loss, is it fair to say that you have none, none which is documented or none that you can express and explain to me right now?

A.    This is not a financial loss case. This is copyright infringement.

Q.    You said that Walgreens stopped... decreased the purchases in the stores which were buying. They were far less. Do you have any e-mail or any communication explaining why they were ceasing to buy from you?

A.    I have an e-mail, but not with an explanation.

Q.    So, any of the stores that you say or any of the clients that you say stopped buying from you, they could have stopped ordering, for example, because of the pandemic, because of inflation, because of tourism changes, because they decided not to carry the plush toys anymore? There could have been different reasons?

A.    There could be different reasons, but it was at the same that the product was on the market.

A.    Around that area.

Q.    So, do you make a fifty percent in gross profit margins? Is that...

A.    Well, what I make in my margins I don't see the need of sharing it with someone that copied one of my items. So, I mean that's just information... it's my business information.

Q.    So, you're not willing to respond to this?

A.    Well, no, my margins and the way I do business, I mean I don't think anyone... if you ask Coca Cola, they won't share with Pepsi.

Q.    You've seen our data. But, we are Defendants here, and we have shared all our costs. You're the Plaintiff. I'm asking a very straightforward question. Do you make a fifty percent gross profit margin?

A.    Around that ballpark.

Q.    Around that ballpark. Do you... so it costs you three dollars to ship from China, to pay tariffs, import fees, storage. All of those costs are three dollars?

A.    It's around that area, around that ballpark.

Q.    Do you have like a spreadsheet where you keep all the costs involved in the... you know... from the manufacturing to the...

A.    Yes, I do.

Q.    Yes, you do. And, do you keep that in an online platform?

A.   No, I keep that in my files.

Q.   Which are where?

A.   In my office.

Q.   In what format are those?

A.   Excelsius.

Q.   Again, electronically stored information, would that be correct?

A.   Yeah.

Q.   So, do you keep... do you have a net... do you keep data of your net profit?

A.   Yes.

Q.   Yes, you do. So, you would be able to have a number?

A.   (NO AUDIBLE RESPONSE FROM DEPONENT.)

Q.   And, you're aware that we requested this information and Plaintiff has not been willing to provide it?

A.   Because I... I'm not willing to provide information to someone that's copying my business.

Q.   Are you aware that there are mechanisms that we can implement to protect your confidentiality?

A.   (NO AUDIBLE RESPONSE FROM DEPONENT.)

Q.   Would you be willing to share that information if we set up protection safeguards?

A.   You can see my tax returns. That's public information.

Q.   That's fine. But, I'm asking about the products which are in question which you have to do with.

Electronically signed by Rafael Vega-Quijano (601-267-767-2205)

6aadf14f-537b-4633-b980-d4bc6e8f4896

Page 160

(BRIEF PAUSE)

(Revision of document by Deponent.)

BY MS. CASELLAS-CABRERA:

Q.   I was asking you questions about this Claim, and we got into a trademark discussion. And, you said "I own a copyright, and I believe trademark is for Coquico, for the Coquico brand, for the nominal part of Coquico.". Do you recall that?

A.   Page twelve?

Q.   Yeah, no, but that is... that was part of your deposition testimony.

A.   Yeah, as far as my knowledge, trademark was for the...

Q.   The nominal part? Would that be correct?

A.   The name and the brand and stuff like that, which I ended up owning as well.

Q.   So, you were making a distinction about copyright, which is the design... and correct me, if I'm wrong here... and the trademark, which is kind of the name of the brand?

A.   As far as my knowledge goes on that.

Q.   And, it is... and there's no question here... and correct me, if I'm wrong... that Defendants have not been using the Wild Encantos or the Coquico brand?

A.   No.

Q.   Okay, fine. So, based on that explanation... I really want to understand... based on that explanation of trademark, Defendants' action using a similar design did not involve

trademark rights?

A.   Well, that's a... it could because, if you sell something similar to what the Wild Encantos line is selling, with that name in it, Wild Encantos, well, that's for... infringers usually don't put the same... they do a similar product without the same brands.

Q.   Okay, so you're saying that there might be a trademark issue due to the similarity of the product?

A.   Yes, yes.

Q.   And, would that be your understanding of what is count two of the Complaint?

A.   I believe so.

Q.   In your own words, can you explain what you're claiming in count two?

A.   What I'm claiming is what it says on the Claim.

Q.   If you might explain that to me.

A.   It says here:

"The unauthorized plush toys and related merchandise which have been distributed and sold by Defendants duplicate and appropriate the likeness of Plaintiff's copyrighted properties in order to dilute and confuse the public into believing that the plush toys and related merchandise have been authorized and supposed by Plaintiff.

The sale of unauthorized products bearing the Plaintiff's copyright properties will dilute the goodwill

and reputation of Plaintiff.".

Q.    And, I want you to explain to me what do you mean by "likeness of Plaintiff's copyrighted properties"? What is the likeness that you allege is copyrighted?

A.    This is the likeness. The same pose, the same eyeballs, the same stitching, the similarities that you can see on... what is this, Exhibit what... Exhibit 3, with Exhibit... I don't know which document that your client...

Q.    The same pose, the same stitching?

A.    Uh huh, yes.

Q.    Anything else?

A.    They have a Puerto Rican flag on it.

Q.    Since when specifically have you sold the plush toy that is shown in Exhibit 3?

A.    2017, I would say.

Q.    Do you have a document in your records that show the first date in which you created and sold that model specifically?

A.    I could probably get you the first order we got with a date.

Q.    So, the last time we also talked about your Interrogatory Responses. And, you stated that there are... there were multiple instances of confusion on a weekly basis. That was part of your response to the Interrogatories. Do you remember that?

A.    Yes.

MS. CASELLAS-CABRERA: And, I'm showing for the record Exhibit 13 to...

A.    Exhibit 13, he showed... he also sent me this picture. I don't know if it's...

MS. CASELLAS-CABRERA: Uh huh, and a picture... the Deponent is showing a picture of what appears to be the handtag of Defendants' parrot toy.

A.    Yeah, the handtag, yeah, which was this also.

MS. CASELLAS-CABRERA: Okay, Deponent is showing a picture of...

A.    But, I don't know if it's this one.

BY MS. CASELLAS-CABRERA:

Q.    That is definitely not the one that was purchased by Carlos Padilla. My question is do you know what happened to that plush toy? Could that be one of the plush toys in Counsel's office?

A.    Probably, probably.

Q.    So, based on this testimony, you cannot... you don't have firsthand knowledge of what happened to the plush toys that you bought and that Carlos Padilla bought?

A.    It's probably all in my Attorney's office.

Q.    Probably. I'm changing a little bit the subject to another allegation in the Complaint.

In the Complaint, you allege that Defendants have acted willfully and with knowledge of your rights. My question to you

is what facts lead you to believe that our client knew about your copyright before you sued them?

A.    Well, once they got the lawsuit, they gave me all the merchandise. They took it out of the stores and sent it to... and delivered it to our warehouse. There were a couple of offers of settling this case.

Q.    To you, does that show willfulness?

A.    No, I'm just saying that it's just... it shows to me that... you know... they knew. They knew that they had copied something or they probably did it without knowing that there was a copyright.

Q.    So, my question to you is do you have any specific facts that would lead you to believe that they knew of your copyright?

A.    I don't think they knew about the copyrights because, in one of the phone calls, he's like "If we would have known, we would have never done it.".

Q.    Correct me, if I'm wrong, but, before this lawsuit, you did not send any Cease & Desist Letter, any e-mail or make any formal Complaint to any employee in Defendants' company?

A.    That's probably they'll have to answer... that has to be answered by my Attorneys because I don't know what they did before the lawsuit.

Q.    But, my question to you is did you sign any letter, did you make any formal e-mail to them?

Page 173

A.    Not me.

Q.    Did you complain about...

A.    Not me.

Q.    Not you, okay. Any specific reason why you did not choose to complain before filing this lawsuit?

A.    Because my Attorneys handle all that.

MS. CASELLAS-CABRERA: If I can have two minutes so I can discuss with my Counsel if we have anything further, but I think we're about to close.

DEPONENT: Sure.

MS. CASELLAS-CABRERA: Rafa.

COURT REPORTER: We're off the record.

(OFF THE RECORD)

(BRIEF PAUSE)

(BACK ON THE RECORD)

COURT REPORTER: We're on the record.

BY MS. CASELLAS-CABRERA:

Q.    Okay, since the last deposition, have you received or reviewed any documents prior to coming here today?

A.    No.

Q.    In terms of preparation for the deposition, can you explain to me what you did beforehand?

A.    Basically, I'm here answering out of the best of my knowledge how we got here. So, I don't think I need to prepare in terms of reviewing anything.

Q.   And, aside from...

A.   Nobody knows my business more than I do.

Q.   I hope so, yes. Aside from discussions with your lawyer, did you speak to anyone else about any of the things that we've discussed or in preparation for this deposition, anyone from your company?

A.   No, no, I mean I've told people that I'm in a deposition for this case, but nothing in terms of...

Q.   Other than you as a corporate representative and as the person in charge of your business, is there anyone else who would know information that is relevant in this case?

A.   No.

Q.   So, is there anything on this deposition... and considering the last discussions in December... is there anything that you testified that you would like to correct, amend or clarify?

A.   No.

Q.   Any facts that you've remembered after that are worthwhile for the record?

A.   No.

MS. CASELLAS-CABRERA: Okay, well, with that, I've discussed with client... with Plaintiff Defendants' wish to leave this deposition open, reserving the right to reconvene and discuss any matter that is relevant to the documents that we've requested, and have not yet been provided.

Page 176

CERTIFICATE OF REPORTER

I, RAFAEL A. VEGA-QUIJANO, Court Reporter and a member of Vega Reportage;

DO HEREBY CERTIFY:  That the foregoing transcript is a full, true and correct record of the testimony given which was taken down by me and thereafter reduced to the typewritten form under my direction and supervision.

I FURTHER CERTIFY:  That I am not in any way involved or interested in the outcome of said action.

WITNESS my hand this March 11, in San Juan, Puerto Rico.

RAFAEL A. VEGA-QUIJANO

Court Reporter