# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| WE, LLC D/B/A/ WILD ENCANTOS<br><br>PLAINTIFFS<br><br>vs.<br><br>CARIBBEAN RETAIL VENTURES,<br>INC., SALVADOR ABADI, ET AL.<br><br>DEFENDANTS | CASE NO.:<br>3:24CV01185(CVR)<br><br>RE: COPYRIGHT<br>INFRINGEMENT |

## TAKING OF THE DEPOSITION OF
## MR. JOEL BENDER RABINOICH

DATE        :    DECEMBER 3, 2025

TIME        :    9:39 A.M. - 10:58 A.M.

CLIENT      :    MS. JANE BECKER-WHITAKER, ESQ.

ADDRESS     :    VIG TOWER, SUITE 1101
                 1225, AVENIDA PONCE DE LEÓN
                 SAN JUAN, PUERTO RICO
                 TEL. 787-620-0527
                 jbw@beckervissepo.com

**BONARD INTERNATIONAL CORP.**
CALLE 1 B13, URB. FAIRVIEW
SAN JUAN, P.R., 00926
787-755-5349
mgbonard@gmail.com
**TABLE OF CONTENT**

2

DIRECT EXAMINATION (MS. BECKER)..........pag. 7

CROSS-EXAMINATION (MS. CASELLAS).........pag. 61


CERTIFICATE OF REPORTER..................pag. 65

CERTIFICATE OF DEPONENT..................pag. 66

CERTIFICATE OF PUBLIC NOTARY.............pag. 67

EXHIBIT..................................pag. 68

3

## TRANSCRIPTION

The taking of the deposition of Mr. Joel Bender-Rabinoich, occurred December 5, 2025, at 9:39 in the morning at Ms. Jane Becker-Whitaker, Ponce de Leon Avenue 1225, Vig Tower Building, 11th Floor, Suite 1102, San Juan, Puerto Rico.

By stipulation of the Parties, Ms. Jane Becker-Whitaker, acted as Notary Public in the taking of the oath of the deponent and the court reporter, for such deposition.

4

**PRESENTS**

FOR THE PLAINTIFFS:

    MS. JANE BECKER-WHITAKER, ESQ.

FOR THE DEFENDANTS:

    MR. ALEXANDRA C. CASELLAS CABRERA, ESQ.

DEPONENT:

    MR. JOEL BENDER-RABINOICH

NOTARY:

    MS. JANE BECKER-WHITAKER, ESQ.

COURT REPORTER:

    MS. SONIA BONET-VALENTÍN

OTHERS PRESENT:

    MR. ÁNGEL E. RODRÍGUEZ-MIRANDA

5

**************************************************

   **All parties being present, the following is the transcript of the proceedings:**

**************************************************

COURT REPORTER:

   Good morning, everyone. Today is December 3, 2025, it's 9:39 a.m. We are on the record.

MS. JANE BECKER WHITAKER:

   Okay, thank you. Court Reporter, before going into the record we have stipulated that you agree under penalty of perjury to make a faithful transcript of the deposition today. Is that correct?

COURT REPORTER:

   That is correct.

MS. JANE BECKER WHITAKER:

   Okay. And then, Deponent, I would ask that you say, state your name for the record.

DEPONENT, MR. JOEL BENDER:

   Joel Bender.

MS. JANE BECKER WHITAKER:

   And do you agree to state everything that you do today under penalty of perjury?

DEPONENT, MR. JOEL BENDER:

   Yes.

6

MS. JANE BECKER WHITAKER:

Okay. Thank you. And then, before entering the record, we stipulated that all objections would be reserved for trial, except for those with respect to privilege and form. That the Deponent would have 30 days to reserve, to review the transcript. If we don't receive a reviewed transcript within that period, the transcript will be deemed correct. And that there are no objections to the transcript being transcribed pursuant to penalty of perjury, nor that Mr. Bender's testimony will be pursuant to penalty of perjury. Is that correct?

MS. ALEXANDRA CASELLAS:

That's correct. Yes.

MS. JANE BECKER WHITAKER:

Okay. And then, I would like to go around the room and have everyone state their name for the record.

MR. ÁNGEL RODRÍGUEZ:

Ángel Edgardo Rodríguez Miranda.

MS. ALEXANDRA CASELLAS:

I'm counsel for Defendants, Alexandra Casellas Cabrera.

7

DEPONENT, MR. JOEL BENDER:

Joel Bender.

COURT REPORTER:

Sonia Bonet Valentín.

MS. JANE BECKER WHITAKER:

And I'm Jane Becker-Whitaker for Plaintiffs, WE, LLC, d/b/a Wild Encantos vs. Caribbean Retail Ventures in the case 24-1185, which is being seen before the Honorable Camille Vélez Rivé in the Federal District Court for the Court of Puerto Rico.

                    ...MR. JOEL BENDER...

                 **AFTER BEING DULY SWORN IN,**

                    **DECLARES AS FOLLOWS:**

                  **...DIRECT EXAMINATION...***

**BY MS. JANE BECKER WHITAKER:**

    Q    Good morning, Mr. Bender.

    A    Good morning.

    Q    Could you please state again your full name for the record?

    A    Joel Bender.

    Q    Okay. And you don't use your maternal surname?

    A    No.

8

Q    Okay. Um, are... Is there anything that interferes with your ability to testify truthfully in the day, in today's deposition?

A    No.

Q    Are you taking any medication today?

A    No.

Q    Okay. What did you do to prepare for the deposition?

A    I, *la licenciada* prepared me. She gave me some questions and we reviewed, and I reviewed the case.

Q    Okay. And when you say you "reviewed the case", do, does that mean that you reviewed the Amended Complaint in the case?

A    Yes.

Q    And you... Which means you read it?

A    I read it.

Q    Okay.

A    I'm not a lawyer, so... But, I read it, yeah.

Q    Okay. And is that the only document that you reviewed?

A    Yes.

Q    You haven't seen the transcript of the deposition that was taken previously in this

9

case?

A    No.

Q    Okay.

COURT REPORTER:

No? I'm sorry, "No"?

DEPONENT, MR. JOEL BENDER:

No.

**BY MS. JANE BECKER WHITAKER:**

And did you speak with anyone besides your counsel, regarding the deposition?

A    Like, what's...? What is...?

Q    Did you speak with anyone else besides your attorney about the fact that you were coming to this deposition today?

A    My wife.

Q    Okay.

A    And the partners.

Q    Okay. And with respect to your partners, what did you talk to, to them about?

A    About coming today to the deposition.

Q    Okay. You didn't ask Mr. Abadi what he testified about?

A    No.

Q    Okay. What is your educational preparation?

10

A    Liberal Arts degree from Clark University, Worcester, Mass.

Q    In what year?

A    Graduated or when it...?

Q    Graduated.

A    1988.

Q    Do you have any post-graduate studies?

A    No.

Q    Okay. What did you do after you graduated from college?

A    I came to Puerto Rico to work in the family's business.

Q    And what business is that?

A    In retail.

Q    What company?

A    Piben Imports.

Q    Season?

A    Piben Imports.

Q    Okay. Piben.

A    Yes.

Q    How do you spell that?

A    Piben.

Q    How long did you work for that company?

A    All my life.

11

Q    Okay. So, has Piben Imports in some way converted to Caribbean Retail Ventures?

A    Yeah.

Q    Okay. When did that happen?

A    2010, 2011. I might be, I might have the days wrong, the years wrong.

Q    But, approximately 2010.

A    Approximately, yeah.

Q    Okay. And why did that happen?

A    The Children's stores, clothing stores. And we decided that the dollar store concept was more profitable.

Q    And when you say "we decided"?

A    The partners.

Q    "The partners". And are those the same people who you are working with today?

A    Yes.

Q    Okay. So, essentially, your entire professional life it was spent in the retail business in Puerto Rico?

A    Yes.

Q    Okay. Do you, how frequently do you travel from Puerto Rico outside of Puerto Rico?

A    Every two weeks, every three weeks. Average, every three weeks.

12

Q     Okay. For what purpose?

A     Pleasure and my kids. My children live in New York, Miami, Panama and, and for business.

Q     When you travel for business, what's the, what is, what is the purpose of that business travel?

A     Trade fairs.

Q     Okay. And where would, where are those trade fairs located?

A     China, Frankfurt, Vegas, Chicago, Turkey, Vietnam and so on, and so on.

Q     Okay. And in general, when you travel from Puerto Rico, you travel from the Luis Muñoz Marín Airport?

A     Yes. Yeah.

Q     Okay. Have you ever had the occasion to visit a concession store in the San Juan Airport?

A     Yes.

Q     Have you ever seen the products of Wild Encantos?

A     Never.

Q     What is your position within Caribbean Retail Ventures?

A     I'm a buyer for certain categories. I work with marketing, and social media.

13

Q    Are you an officer of the corporation?

A    Yes.

Q    What position?

A    Vice-President.

Q    Who's the President?

A    Mr. Abadi.

COURT REPORTER:

Who? I'm sorry.

DEPONENT, MR. JOEL BENDER:

*El señor Abadi*, Mr. Abadi.

**BY MS. JANE BECKER WHITAKER:**

Q    And the Secretary of the corporation is?

A    Alon Shaked. A-l-o-n, Mr. Shaked, that's S-H-A-K-E-D.

Q    And the Treasurer?

A    The Treasurer I think it's Mr. Shaked too.

Q    It's the same?

A    Yes.

Q    Yes. Do you have formal board meetings?

A    Yeah.

Q    How frequently?

A    It's like two times a year. Informal we meet everyday.

14

Q    Because you're all working at the same place.

A    Informal, yes.

Q    Yeah, I'm sorry. I usually give a little speech about how everybody needs to say things and stuff.

A    *Me vas explicando.*

Q    Because we're all sitting here, it's normal, it happens.

A    Yeah.

Q    And I kind of go like that. I just wanted to get moving along in this one. So, so, you work as a buyer. What does that work consist of?

A    Sourcing... and putting the orders, placing the orders.

Q    And how do you go about sourcing products?

A    The fairs. Usually sourcing the fairs, we have vendors that visit us in, in our office. Basically, that's what we do.

Q    Um, how many people work for Caribbean Retail Ventures?

A    I believe it's like 1,200.

Bonard International Corp.
Urb. Fairview, B13 Calle 1, San Juan, P.R., 00926-7615
787-755-5349/787-630-9966

15

Q    And that includes everybody in all the retail outlets, right?

A    Yes. Yes. It could vary. That's... All these are approximate. I mean, it could be a 1,300 now, because it's Christmas. But..

Q    Uh-huh. How many stores are there?

A    We're up to 97.

Q    Is that the most that's ever been or has it reduced over time?

A    No. It's the most.

Q    Okay. And in terms of marketing, what, what work does that entail?

A    That entails marketing in the stores. Like visual, visual, POP's, point of sales... ahm, how to place the goods in the store, how the store looks.

Q    And with respect to products that are, that are directed towards either... Now, what I'm trying to get at, and I'm sure you'll understand, is towards products that are within the group of the products that we are talking about here, the plush toys of the coquí and the parrot. And so, thinking of those, is somewhat tourist, um, directed to the tourist market, but also directed to the market for local buyers.

16

A    Okay.

Q    But, basically, things that are, that are associated with typical Puertorrican products. Is there a place that those products are placed within the stores, towards the front of the store, is it, if you want it towards the back, so people would walk by other things?

A    It varies, we have different formats and different footprints.

Q    Uh-huh.

A    So, there are stores that have them in the back, there's stores that have it in the front of the store, in the entrance, and there's stores that have it at the exit of the, of the store.

Q    And the exit...

A    It's like a race track. So, you know, it could be in the back, it could be in the entrance, it could be in the exit. That's...

Q    And is the rationale for that that these are attractive products that are, if they're put in the back of the store, then people will pass by other products that they might purchase as well? What is the rationale for that? And, sorry, sorry, sorry. But, you said no to my first

17

question, by shacking your head.

A    No, what?

Q    When I said is the rationale for that the people would go to the back of the store to pa... after they pass by other products.

A    Not necessarily.

Q    Okay.

A    Not necessarily.

Q    Okay. But, you were shaking your head, I just want to get it for the record.

A    No, no, no, no, not necessarily.

Q    Okay.

A    It depends on the town, it depends on the client, it depends... Our souvenir category is strong in certain areas, not in the whole chain. We're all over the island.

Q    Uh-huh.

A    So, depends.

Q    Okay. So, you don't necessarily have souvenirs in every one of the stores?

A    We might have a small representation, because it does not sell, or it sells very little.

Q    Okay. But, some stores are identified as stores that would be, the, the clientele would

18

be, to a certain degree, tourists?

A   Yes.

Q   Okay. And, would you consider these items to be impulse items that people would purchase without necessarily intending to go to the store to buy that?

A   I don't believe so.

Q   Okay. And, do you have a defined list of stores that are considered to be tourist stores or souvenir....? There would be a larger percentage of souvenirs?

A   Yes.

Q   Okay.

COURT REPORTER:

Yes?

DEPONENT, MR. JOEL BENDER:

Yes.

**BY MS. JANE BECKER WHITAKER:**

Q   Okay. Who decides on the visual or a set-up appearance of the Always 99 stores?

A   It depends on the merchandise or on the, the way the store is assembled. Like the racks or the *gondolas*. The merchandise is decided by the buyers.

19

Q    Who are employees of Always 99, okay. You have to say yes.

COURT REPORTER:

Yes?

DEPONENT, MR. JOEL BENDER:

Who are employees of Always 99.

**BY MS. JANE BECKER WHITAKER:**

Q    Again, you have to verbalize it.

A    Oh, yeah? Well, I said buyers. All the buyers are employees of Always 99.

Q    Okay. Okay. It's just that I said "the buyers", and you nodded your head. So, it's not going to go on the record.

A    Okay.

Q    That's the only... I mean, I just wanted to get it on the record.

A    Okay, yeah.

Q    Thank you. The buyers... And then...

A    So, when I say the word "buyers" *es* Always, they're buyers of Always 99.

Q    Okay, yeah.

A    Every time I say "buyers", buyers of Always 99.

Q    Okay. And then, as to... okay. What we were saying was, with respect to the set-up

20

appearance of the stores. They're, it's sort of bifurcated into, there's the merchandise and then there is the displays. Who decides, who makes decisions about the displays?

A    The buyers of the compo... of Always 99 decide how they are going to display their goods.

Q    Okay. So, they both decide what merchandise to display and how to display it?

A    Yes.

Q    Okay. And how many buyers are there?

A    There's two principal buyers.

Q    Who are they?

A    Me. ¿*Tengo que decir el nombre*?

Q    Yes.

A    Joel Bender. And...

Q    Just don't nod your head.

A    ...and Salomon. Yeah, I am going to get a neck brace.

Q    Yes.

A    And Salomon Abadi.

Q    Okay. And when you say you have casual daily directors meetings at the company's headquarters, at those meetings, throughout those discussions, you talk about what should, what merchandise should be placed at the stores. Is

21

that correct?

A    No.

Q    Well, then how does it work out?

A    We have weekly meetings with the supervisors, where the merchandise and other goods are... how we're going to market the goods are kind of decided.

Q    How many supervisors are there?

A    It fluctuates. Right now, I think we have nine.

Q    And is it nine because we are in Christmas season, so that it's up or...?

A    No. It's nine because it's nine always.

Q    Okay. When you have those meetings, are there any documents that document such meetings? Are there e-mails that are exchanged before the meetings, are there to-do-lists that result from those meetings?

A    No. To-do-lists that result from the meeting? Written?

Q    Right.

A    No.

Q    Okay.

A    It's spoken in the meeting.

22

Q    Okay. Are there weekly or monthly goals established?

A    In what?

Q    With, with respect to moving the merchandise that you have to sell.

A    Yes. They, you know, whatever instructions are, they should do it.

Q    Right. But, are the instructions ever written down?

A    No.

Q    Okay.

A    Supervisors...

Q    Okay. Now, how does a new product come to be sold at Always 99? Something that's never been sold before.

A    What do you mean? Like what...

Q    Well, you know, this cactus that's sitting on this table, it was purchased at Ikea.

A    Okay.

Q    So, the person who makes this product, that's a product that might be viable for your store, how does somebody who wants to introduce a new product to Always 99, what challenge does that person have?

23

A    They have to... contact to the buyer or contact the buyer.

Q    Okay. And how does Always 99...? Does Always 99 ever come to a conclusion that it needs a new product and it's going to create that product?

A    Each buyer, principal buyer, with his team decides.

Q    Okay. And who are those buyers?

A    The principle?

Q    Yeah, besides, there's you and Abadi.

A    Yeah.

Q    And that's it.

A    The principle.

Q    Okay. But, as subordinate to them, how many people are there?

A    I have two.

Q    Okay. And who are those people?

A    Leydaliz Hernández and Tai, T-a-I, Massas, M-a-s-s-a-s.

Q    And do other people report to Mr. Abadi?

A    His team?

Q    Yeah.

A    You want the names?

Q    Yes, please.

24

A    Alinés, her name I don't have it.

Q    Uh-huh.

A    And... Alinés Ayala.

Q    Okay. It's, it's written.

A    And, and Cielo, I don't know her last name.

Q    Okay. And, you know that this lawsuit involves the plush toy coquí and the plush toy parrot, correct?

A    Uh-huh. Yes.

Q    Who was the person who designed those plush toys?

A    I don't know.

Q    Okay. Who worked with getting these plush toys into the stores?

A    I don't know. When you say "get into the stores", what does that mean?

Q    So that they can be sold in the stores?

A    I don't know. I mean, I guess the buyer, right?

Q    So, if, if it weren't you, than the only other person is Abadi.

A    Yeah.

Q    Correct? Okay. And I did ask him in detail about all of this, so. Does Always 99 have

25

any sort of intellectual property policy?

A    We're very strict about it.

Q    Okay.

A    Very strict about it. And we don't play around.

Q    But, how is that implemented?

A    We look at the items and we make sure, we try to make sure that, that there is no IPR violations.

Q    Is there a written policy regarding, regarding intellectual property?

A    I believe so, I believe so. Again, I said I believe, I am not sure.

Q    Okay, right.

A    Okay.

Q    We'll follow-up, I'm trying to make notes.

A    Okay.

Q    Remind me to do so.

A    Okay.

Q    And you say that you are very strict. What's the process for trying to identify whether there's a...?

A    We go to great lengths. We have a lawyer in New York who, who is on-call everyday, who...

26

besides our personal knowledge, helps us with any doubts that we have. It's not, it's not what we do.

Q    And you're aware that ex... there, there exists these law suits that are brought by major players in the IP business, like Mattel and Disney and Nike, and that they will target stores, not like, I mean, I don't want to categorize them like your stores, but non-chain dollar stores that carry pirated items, correct?

A    Yes.

Q    And what they tend to do is go in and attempt, you know, go in with a Marshall and attempt to confiscate the materials, correct?

A    Yes.

Q    And that's, obviously, something that your store tries to avoid.

A    Yes.

Q    And what's the name of the attorney in New York?

A    CJ Erickson.

Q    This, is it a firm or is he a sole practitioner?

A    It's a firm.

Q    And what's the name of the firm?

27

A    I don't know. Uh-uh.

COURT REPORTER:

    "Uh-uh" is you don't...?

DEPONENT, MR. JOEL BENDER:

    I don't...

COURT REPORTER:

    You don't know. Okay.

**BY MS. JANE BECKER WHITAKER:**

    Q    Do you know if, is it Mr. Erickson?

    A    Yeah.

    Q    Okay. Do you know if Mr. Erickson was consulted with respect to this lawsuit?

    A    I don't know.

    Q    When was the first time that you had knowledge that there were allegations that the coqui's of Wild Encanto's were similar to the ones that were being sold in the Always 99 stores?

    A    When we received the, the lawsuit.

    Q    And what did you do as a result?

    A    The exact action was taken by Mr. Abadi and by Mr. Shaked. I believe they picked up everything up, that I believe, immediately. But, again, I wasn't involved.

    Q    Okay.

28

A    It's not my category, I wasn't involved.

COURT REPORTER:

I am sorry, "it's not my"?

DEPONENT, MR. JOEL BENDER:

It's not my category of... that I buy.

**BY MS. JANE BECKER WHITAKER:**

Q    Well, but Mr. Abadi also is a buyer.

A    Yeah.

Q    Correct? And he was the one who was involved with these purchases, correct?

A    Yeah. Him and his team. I don't know in what capacity he was involved, because I was not there, I don't know. But, him and his team.

Q    Is Always 99 currently selling the *pava* hat?

A    The *pava* hat?

Q    Yeah.

A    Was it or is it?

Q    Is it currently?

A    I don't know if we have any left. I believe we don't.

Q    And when you say that "have any left", was there a large amount purchased at one time and then...?

A    I don't think...

29

Q    Okay.

A    I'm not sure, I don't buy that.

Q    Okay. How about hibiscus or *amapola* flowers?

A    So, what, the hairpins?

Q    Yeah.

A    I don't think we carry that.

Q    In your knowledge, what are the souvenirs...? This is an overview of what are the souvenir items that Always 99 does carry.

A    I mean, I, visually, because I have no idea. I think they do some mugs. They might do mugs, ceramic, shot glasses, key-chains, I guess.

Q    Do you know who sells those products to Always 99?

A    No.

Q    Has Always 99 ever been sued for copyright infringement in the past?

A    No.

Q    Has it ever been sued for trademark infringement?

A    No.

Q    Has the board of directors of Caribbean Retail Ventures ever discussed this litigation?

A    Yes.

30

Q    And what was discussed?

A    Settlements were offered, they were rejected.

Q    Does the corporation have reserves in place as a contingency in this case?

A    I don't know.

Q    Okay, I don't care about this... If you give me like three minutes, I just literally need to staple it on.

A    Okay.

COURT REPORTER:

You want me to go off the record?

MS. JANE BECKER WHITAKER:

No, I don't think so.

COURT REPORTER:

Okay.

**BY MS. JANE BECKER WHITAKER:**

Q    Do you recognize that document? It's the...

A    Yeah.

Q    ...answers to your interrogatories.

A    Uh-huh.

MS. ALEXANDRA C. CASELLAS CABRERA:

Can you take a look?

31

DEPONENT, MR. JOEL BENDER:

*Sí, sí, es el mío. Sí.*

**BY MS. JANE BECKER WHITAKER:**

Q    Okay. Could you please turn to page ten of the document?

A    Ten?

Q    Yeah. And there, you certify under penalty of perjury that all the answers there are true and correct, correct?

A    Yeah.

Q    And that's your electronic signature, correct?

A    Yeah.

Q    And you authorized that electronic signature because, in fact, the answers in that document are true and correct?

A    Yes.

Q    Now, if you would turn to page four of the document. In there the answers indicate that your pri... your  responsibility primarily involved locally sourced purchasing decisions, correct?

A    Yeah.

Q    Those are your primary responsibilities.

A    Yeah.

32

Q    What are you secondary duties?

A    In, in what role? As a buyer or as...

Q    As a buyer.

A    Sourcing daily items.

Q    Daily items?

A    Yeah.

Q    Which should be food or?

A    Anything. Food, chocolates, brooms, detergents, health and beauty items... disposable items, paper.

Q    Okay. And, would it be fair to say that the rest of that answer to that question addresses your lack of involvement in the plush toy items?

A    Exactly.

Q    Okay. And so, you were not involved in any way in choosing the *coquí* for sale?

A    Nothing.

Q    And the same is true of the, of the parrot?

A    Yes.

Q    Okay. I do have some questions about, and that's what... we have the *coquíes* here. When was the first time that you ever saw the *coquí* that was being sold in the Always 99 stores?

33

A    I can't, I can't tell you the exact date.

Q    Uh-huh.

A    Maybe, a month after the lawsuit or two months after. I can't.

Q    But it was after the lawsuit?

A    Yeah. Yeah. Much out more, you know, maybe three or for months, I'm not sure.

Q    What was your reaction as the allegations that the two items, the *coquí* distributed by Wild Encantos and the one from, being sold at Always 99 was substantially similar?

A    In what sense?

Q    That they look alike.

A    Well, I really didn't pay, you know, I don't think they look alike, you know, there's things... I really wasn't involved. So, I might have thought about it for ten minutes. If you ask me to tell, you know, but I... there was marked differences that we saw, that I saw when, when I saw the items.

Q    Okay. So, you weren't involved in the decision to sell the items of...?

A    No, no.

34

Q    But, as with any item, as of the daily items, the cleaning, the health and beauty items and the food, in the same way, you, as a shareholder of Caribbean Retail Ventures, benefitted when there were sales and profits from these, from the items, from the plush toys that are involved in this case, correct?

MS. ALEXANDRA C. CASELLAS CABRERA:

Before you answer, I'm going to make an objection for the record, objection to form. If you know, you can answer, just for the record.

DEPONENT, MR. JOEL BENDER:

Tell me the question again.

**BY MS. JANE BECKER WHITAKER:**

Q    That, as with every item that's sold in an Always 99 store, you, as a shareholder of Carribean Retail Ventures, profit when there are profits made from such items.

A    Not necessarily. Not necessarily. I mean, maybe the... that you're the overhead of the company, not necessarily.

Q    Well, it would depend then in whether the company made money?

A    I'm not the, I'm not the company, I'm a shareholder.

35

Q    And you benefit from being a shareholder of the company.

A    Yeah, I guess.

Q    Why would you not benefit?

A    I do, yeah.

Q    Has the company, company ever lost money?

A    No.

Q    Okay. In the fifteen -approximately fifteen- years of its existence, it's never lost money?

A    No.

Q    Okay. Then if you return to the document that you have I front of you, the interrogatory two.

A    What page?

Q    I think it's on the same page 4.

A    Okay.

Q    So, it asks you to identify everyone with knowledge of the relevant facts and ask for a summary of that knowledge, correct?

A    Uh-huh.

COURT REPORTER:

Uh-huh, is yes?

36

DEPONENT, MR. JOEL BENDER:

Yes.

COURT REPORTER:

Okay.

**BY MS. JANE BECKER WHITAKER:**

Q    Okay. And then, the answer to that question refers us to the initial disclosures that your attorney made in the case, is that correct?

A    Yes.

Q    Okay. So now, I have another document, which is the initial disclosures, and that turns to the page where the people with knowledge have been identified, correct?

A    Yes.

Q    And the first person listed is Salvador Abadi, correct?

A    It's Salomón.

Q    Right, that should be, that was... yeah.

A    Yeah. A typo.

Q    Yeah. And I think it was actually our bad. Because that's what we put on the Complaint, so.

A    Okay.

37

Q    But then... and, it says that those four names are potential witnesses, including the topics on which they may testify. But there's just a list of names without, without any topics, correct?

A    Yeah.

Q    Okay. So, what knowledge would Salomón Abadi have about the facts of this case?

A    I can't answer that. You would have to ask him.

Q    Well, in your answers to interrogatories you said "go to the initial disclosures". I go to the initial disclosures and it gives me the name of the person, and it says there is going to be a list of topics. I asked for a summary of their, their knowledge and then, so, it's just a non-answer. I mean, it's an answer as to this is the person. But you are not telling me what knowledge he has.

MS. ALEXANDRA C. CASELLAS CABRERA:

I'm going to make an objection for form here.

DEPONENT, MR. JOEL BENDER:

I don't understand the question.

MS. ALEXANDRA C. CASELLAS CABRERA:

Yeah.

38

**BY MS. JANE BECKER WHITAKER:**

Q    What knowledge does Mr. Abadi have about this case?

A    He's the buyer.

Q    Okay.

A    Of, and in charge of the plush business.

Q    So, he would have knowledge about how these particular plush toys were chosen?

A    Yes.

Q    Okay. And then, the second person identified is you. What knowledge do you have about the allegations of the Complaint?

A    None. None.

Q    Okay. Well, one of the allegations in the Complaint actually is that you benefit from the sales of the plush toys, correct?

A    Benefit in what sense? I don't understand. I would...

Q    In the sense that the company makes profits and you as a shareholder benefit from those profits.

A    I guess, yes.

Q    Okay. I mean...

A    Yeah.

Q    ...is either true or not, right?

39

A    Yes.

Q    Okay. Then, and that's the only knowledge that you have about the allegations in the lawsuit? Except for, no, let me re... It's my understanding that part of the knowledge that you have about the lawsuit, it's that after the lawsuit these products were removed from the stores.

A    Correct.

Q    Was that a joint decision made among the members of the board of directors?

A    It was spoken about in one of the meetings. Yeah, I guess.

Q    Okay. And you, were you present at that meeting?

A    Yes, yes.

Q    So, what was said about what needed to be done?

A    Exactly then, get the goods out of the stores.

Q    And who said that?

A    It was decided. It's a... we, right away, that's what we would have done, the three of us, that's the correct thing to do.

Q    Okay.

40

A    Get the goods out of the store.

Q    And is there any particular one of the three of you, three of you who made that suggestion?

A    I don't remember.

Q    Okay. But, you were all in agreement that that's what needed to happen.

A    A hundred percent.

Q    Okay. And then, the next person on the list...

A    Alon.

Q    ...yeah. What knowledge does he have about the facts of the lawsuit?

A    In what sense? In, like, the legal part of the lawsuit?

Q    No, the facts of the lawsuit.

A    He should have knowledge of the facts of the lawsuit at, in the legal part. Because he's the one who would be taking care of something like this.

Q    Okay. Addressing the legal problem?

A    Yeah.

Q    Okay. He, he would not have... So, his position on the board of directors is Secretary-Treasurer, correct?

41

A    Uh-huh.

COURT REPORTER:

Yes?

DEPONENT, MR. JOEL BENDER:

Yes.

**BY JANE BECKER-WHITAKER:**

Q    Okay. So, he would not have been involved in the decision making as to the purchase of these items?

A    In a... Absolutely, no.

Q    Okay. His involvement would be as to whether, as how to resolve the legal problem?

A    Exactly.

Q    Okay. And, just to in... is it, is it a fair statement to say that he's not that involved in the operations of the company? Or is he involved in the operations of the company?

A    In the operations, in the operations he is involved, not in the buying, absolutely, not.

Q    Okay. What element of the operations does he address?

A    Anything, any, anything that has to do with finance, anything financial.

Q    Okay. And he's a shareholder as well, correct?

42

A    Yes.

Q    Okay. And then, the third person is Ms. Ayala.

A    The fourth person.

Q    The fourth person, sorry.

A    Alinés, yeah.

Q    What knowledge would she have about the facts of the case?

A    I have no idea.

Q    Well, in your answer you're referring me to these disclosures.

A    Because she's a buyer.

Q    Okay.

A    I have no idea. She's in Mr. Abadi's team.

Q    Okay. What is Ms. Ayala's title?

A    Assistant-Buyer.

Q    "Assistant-Buyer". Okay, if you go to interrogatory three...

A    Page?

Q    I think it's on page four.

A    Page five. Page five?

Q    Yes. So, I'm asking you about the materials relevant to the case, correct?

A    Okay.

43

Q    And, once again, there is a reference back to the Rule 26, materials.

A    On this page, on here?

Q    That document.

A    What page?

Q    It's... there's the, there's a page with a chart, the next page, there.

A    Okay.

Q    So, the chart, however, identifies the customs documents, correct?

A    Yeah.

Q    Who collected the information as to the customs documents?

A    The Traffic department.

Q    Okay. Is there, would there be a person within the Traffic department?

A    Desiré, Desiré, I don't know her last name.

Q    But, among, so, the documents that are identified are the documents that are regarding the Customs Department?

A    Uh-huh, uh-huh.

Q    The customs materials, which identify certain shipments that apparently contained the products that are the subject of this lawsuit,

44

correct?

A    Yeah.

Q    But, the question I am asking in the interrogatory is about the origin of the decision to have the plush toys manufactured. And then, there's a reference to the Rule 26. Nowhere in the Rule 26 documents is there any discussion of those documents. Like e-mails to the manufacturer or...

MS. ALEXANDRA C. CASELLAS CABRERA:

I am going to object to form. What's the question there?

MS. JANE BECKER-WHITAKER:

The question is what are the documents that would identify how the decision was made to have the *coquí* plush toys manufactured.

MS. ALEXANDRA C. CASELLAS CABRERA:

Do you know the answer to that?

DEPONENT, MR. JOEL BENDER:

*Ni idea*, no idea.

**BY MS. JANE BECKER WHITAKER:**

Q    Okay. And the person that would've, that, who knows that is Abadi, correct?

A    Yeah.

45

Q    Do you know whether there were prototypes of the plush toys made?

A    No.

Q    *Llegó el notario*. Oops.

NOTARY:

Do you need a *notario*, or are you still...

MS. JANE BECKER WHITAKER:

No, no, no.

NOTARY:

Ah, okay, okay.

**BY MS. JANE BECKER WHITAKER:**

Q    You testified that you never saw Wild Encanto's plush toys being sold at the airport, correct?

A    Yeah, correct.

Q    Did you ever see them being sold at Walgreens?

A    Never.

Q    Did you ever see them being sold anywhere?

A    Never.

Q    Did anyone at Caribbean Retail Ventures ever object to the idea of selling the *coquíes*?

A    I don't know.

Q    Anyone object to selling the *cotorra*?

46

A    I don't know.

Q    When the, when you received the lawsuit, did you make any effort to determine how long the Wild Encanto's products had been in the market?

A    That was not me. Probably Mr. Shaked.

Q    Did anyone review the copyright office for registered products?

A    Probably Mr. Shaked.

Q    Okay. Is that, such a review done at the time of the introduction of a new product?

A    What do you mean?

Q    Well, for example...

A    Like this?

Q    ...right. The, the plastic cactus, or if there's a new, even a cleaning product, something that you are involved with?

A    The minimum doubt that we have, we review it. And we make a decision. Usually, if there's a minimum doubt, we don't do it.

Q    Would that mean that in this case you didn't consider it, because you didn't know there were other products?

A    I don't know, I was not involved.

COURT REPORTER:

I'm sorry, can you repeat that?

Bonard International Corp.
Urb. Fairview, B13 Calle 1, San Juan, P.R., 00926-7615
787-755-5349/787-630-9966

47

DEPONENT, MR. JOEL BENDER:

I don't know. I was not involved.

**BY MS. JANE BECKER WHITAKER:**

Q    Okay. Then, if you go to interrogatory four, in the answer to the interrogatories.

A    Okay.

Q    Okay. So, in that answer you direct us, the Plaintiff, to your Motions to Dismiss and the arguments that you made in those motions, correct?

A    Uh-huh.

COURT REPORTER:

"Uh-huh," yes?

DEPONENT, MR. JOEL BENDER:

Okay, yes.

**BY MS. JANE BECKER WHITAKER:**

Q    And are you aware that the Federal Court denied the Motion to Dismiss in this case?

A    Yes.

Q    And are you aware that you're, you're sued personally?

A    Yes.

Q    Are you aware that Mr. Abadi is sued personally as well?

A    Yes.

48

Q    Okay. So... And what that means is a question of whether the two items are substantially similar, is for a Jury to decide, correct?

A    Yes.

Q    Okay. And then, let me just get one second to bring the other document. And that would be true with respect to the, the *coquíes*, correct?

A    Uh-huh.

Q    Yes?

A    Yes.

Q    Okay. And then... I just brought in the *parrots* as well. And, so, you understand that also there would be a decision, a Jury would decide whether the *parrots* are the same.

MS. ALEXANDRA C. CASELLAS CABRERA:

Are we marking those as part of the deposition?

MS. JANE BECKER WHITAKER:

Can we mark them?

MS. ALEXANDRA C. CASELLAS CABRERA:

So, the Exhibit 1 is the interrogatory, the answers. The second is...

49

MS. JANE BECKER WHITAKER:

Right. Two is the...

MS. ALEXANDRA C. CASELLAS CABRERA:

Two is the initial disclosures and then, what will you do with this, are you marking them or not?

MS. JANE BECKER WHITAKER:

Are you okay with us marking *todos*?

MS. ALEXANDRA C. CASELLAS CABRERA:

Yes.

MS. JANE BECKER WHITAKER:

Okay.

MS. ALEXANDRA C. CASELLAS CABRERA:

If you send me those before, we can approve, and then we can mark those as, as Exhibit 3.

MS. JANE BECKER WHITAKER:

Right. Okay.

MS. ALEXANDRA C. CASELLAS CABRERA:

Okay, that would be fine.

**BY MS. JANE BECKER WHITAKER:**

Q    So, are you, do you know how long the, Always 99 has been selling its products in the stores?

A    No.

50

Q    If you look at the hand tag on the, on the *parrot*, that one says that it was, that it's from September of 2023, correct?

A    Yeah.

Q    Is that...?

A    2021.

Q    2021?

A    Yeah.

Q    Okay. So, that would be the manufacturing date?

A    I guess.

Q    Okay. That's not necessarily the date when it arrived in Puerto Rico, correct?

A    No.

Q    Okay. Okay. And then, we got the other one too. So, in... this one it's 2023. This is the 2023 one.

A    Okay. *Es más barato*. Okay.

Q    And it's, so, and it's, would you agree that the beak on those two, the two ones that are Always 99, is not the same color?

A    Yeah.

Q    And would you agree that they are not the same size?

A    I would need a ruler. I don't know.

51

Q    Okay.

A    And visually, they look the same.

Q    So, with respect to the Court's denials of the Motions for, to Dismiss, you understand that that also, that that means that you and Mr. Abadi also have potential personal responsibility for the copyright infringements?

A    I understand perfectly.

Q    Okay. And that so, and the potential statutory damages are, is the maximum, it's $150,000.00?

A    I don't know the number, but...

Q    Okay. And that's, that would be per infringement. Which says, I mean, per sale.

A    If you say so, if you say so, I guess it's right.

Q    It means, per, per adorable plush toy.

A    Yeah.

Q    So... and you are also aware that the copyright law provides for the payment of the prevailing party's attorney's fees?

A    If she says, if it's, if you're saying it, I guess.

Q    Okay. But, you're not necessarily aware of that?

52

A    No.

Q    Okay.

A    No.

Q    That's the question. So, how it is Caribbean Retail Ventures compensate you?

A    Salary.

Q    Okay. Do you also receive dividends?

A    It depends.

Q    And did you receive dividends in 2024?

A    Yeah.

Q    Okay. And in 2023?

A    Probably.

Q    Do you receive stock options as well?

A    No.

Q    Do you remember a year when you did not receive dividends?

A    I don't know, it could have happened. But, I don't know. It's been many years.

Q    Is your salary in any way tied to the performance of the company?

A    No.

Q    Does it va...?

A    But, at the end, yes, I guess, right? But, no.

53

Q    Well, if the company wasn't, if the company wasn't making money, you wouldn't get a salary, right?

A    Exactly, yeah.

Q    Exactly, yeah. Okay. When the board has formal meetings, do those formal meetings generate minutes?

A    Yes.

Q    Okay. And at the formal meetings, was the question of litigation addressed?

MS. ALEXANDRA C. CASELLAS CABRERA:

Objection to form. Go ahead and answer.

DEPONENT, MR. JOEL BENDER:

*No recuerdo*. Don't remember.

MS. JANE BECKER WHITAKER:

Okay. You can mark those exhibits, 1 and 2. The 1 would be the Answers to Interrogatories by Mr. Bender, and 2 would be the Rule 26 Disclosures. And then this one would be a copy for your counsel.

DEPONENT, MR. JOEL BENDER:

*Está bien*.

**BY MS. JANE BECKER WHITAKER:**

Q    Okay. That's the Corporate Annual Report from 2022, correct?

54

A    Yeah.

Q    And that document indicates that the company had sales in excess of $3,000,000.00, correct?

A    Uh-huh, yes.

Q    Well, let's mark that document Exhibit 3. Well, let's mark the...

COURT REPORTER:

Let's mark this Exhibit 3, and then, when you put the photos, then...

MS. JANE BECKER-WHITAKER:

We'll add them at the end.

COURT REPORTER:

Yes.

MS. ALEXANDRA C. CASELLAS CABRERA:

That was the last one, okay.

**BY JANE BECKER-WHITAKER:**

Q    Those are the audited balance sheets for Caribbean Retail Ventures for the years ended 2023 and 2022, correct?

A    Yeah.

Q    What is the source for the information in that document?

A    The accountant.

Q    Is that a...? The way you said...

55

A    And it's my, it's... The, the thing is, that it's done in conjunction with the accountant and Mr. Shaked.

Q    Okay. And it's also based on the books of Caribbean Retail Ventures, correct?

A    Yeah, yeah.

Q    That's what they used to create the audited balance sheets, correct?

A    Yes.

Q    So, and if you go to page five of that document...

A    Okay.

Q    ...and then at the, if you, for the column that is 2023, the third line.

A    At the top?

Q    Third line from the bottom, actually.

A    Okay.

Q    It's retained earnings.

A    Okay.

Q    And that's a number that's more than $23,000,000.00, correct?

A    Yeah.

Q    And the total stockholders' equity is a number that is more than $21,000,000.00.

A    Yes.

56

Q    Is that correct?

A    Yes.

Q    And what percentage of that equity is yours?

A    Thirty-three.

Q    Okay. So, if the company were to be, to receive a statutory, were to incur in statutory damages in this case, in the amount of $150,000.00 for each infringement, which would be for each copyright, which should be a total of $300,000.00, that would not bankrupt the company, would it?

MS. ALEXANDRA C. CASELLAS CABRERA:

    Objection to form.

DEPONENT, MR. JOEL BENDER:

    I don't know. You would have to ask Mr. Shaked.

**BY MS. JANE BECKER WHITAKER:**

Q    Okay. So, you're saying you don't know whether $300,000.00 would bankrupt a company with retained earnings over $23,000,000.00?

A    I don't know.

Q    Okay. And a, the imposition of statutory damages of $300,000.00 to you, as a person with equity in the company of over $7,000,000.00,

57

would not bankrupt you personally, would it?

MS. ALEXANDRA C. CASELLAS CABRERA:

Objection to form again. Go ahead.

DEPONENT, MR. JOEL BENDER:

I would have to check with my accountant, right now. I would... I don't know.

**BY MS. JANE BECKER WHITAKER:**

Q    But, you do know that the difference between $7,000,000.00 and $300,000.00 is $6,700,000.00, correct?

A    Yes.

Q    That's a arithmetic.

A    Yeah.

Q    Okay. Then let's mark that as Exhibit 5.

COURT REPORTER:

I'm sorry, this will be 4.

MS. ALEXANDRA C. CASELLAS CABRERA:

This will be 4.

**BY MS. JANE BECKER WHITAKER:**

I'm sorry. That's one of my skills. I can never follow the order.

Q    How frequently does Caribbean Retail Ventures perform physical inventories?

A    Once a year.

Q    Okay. How, how does that process work?

58

A    We contract a company.

Q    What company is that?

A    I don't know.

Q    Okay. Is it always the same company or does it vary?

A    It seems it's always the same company. But, I would probably say I don't know. It could have changed in the past ten years.

Q    Okay. And then, what does that company do?

A    They physically count the inventory in the stores.

Q    Every store?

A    Every store.

Q    Okay. And other than the physical inventory, how are inventories of the goods, how, how, if you were to go to the store today, how would you find out how many plastic cactuses are in each store or any item? I'm just using...

A    We have a P.O.S.

Q    Okay. And how long has the P.O.S. system exist?

A    Three years.

Q    "Three years". Starting in 2022?

A    I'm giving you an approximate.

59

Q   An approximate, okay.

A   It might be four.

Q   Uh-huh.

A   But, about three or four years.

Q   Okay. And the, correct me if I am wrong, the purpose of the physical inventory is to match that against the P.O.S's, which are done daily or monthly?

A   Yes, it's...

Q   Constant?

A   ...in... everyday...

Q   It's a perpetual...

A   Yeah.

Q   Yeah. Okay.

A   It's like... When it works.

Q   Regarding all the items that are sold at the Always 99 stores, do you have input into whether all of them are sold or is there a sort of a bifurcation in between the different products?

A   Input in my goods.

Q   Okay. And your goods are what you identified as the daily items?

A   Exactly.

60

Q    Okay. What sort of monitoring does Always 99 do of what its competitors are selling?

A    Newspapers.

Q    Okay.

A    Shoppers.

Q    As in like a secret shopper?

A    No, no, shoppers.

Q    Oh, the shoppers.

A    The newspapers.

Q    Okay, okay.

A    Yeah.

Q    And is the purpose of that, both, to identify what products are being sold and the prices at which they are sold?

A    Yeah, I am talking about myself.

Q    Right.

A    And, because I buy daily items. A Clorox is a Clorox and a, and a soap is a soap. So, I have to see that my price is the same, you know, it's competitive with the competitor.

Q    Okay. Anyway, let's go off the record for a minute. And then, we will consult and come back.

COURT REPORTER:

We are off the record, it's 10:53 a.m.

61

**....OFF THE RECORD...**

**...CROSS-EXAMINATION...***

**BY MS. ALEXANDRA C. CASELLAS CABRERA:**

Q    So, good morning. For purpose of the record, I'm Alexandra Casellas, attorney for Defendants. Mr. Bender, a few questions, just to be clear. So, you were asked about the plush toy category. As part of your job, do you select, design or in any way approve plush toys that are sold in Always 99 stores?

A    No.

Q    Okay. Do you have any sort of operational responsibility over the plush toy products?

A    No.

Q    Do you supervise any person that is directly involved in the selection, design, process?

A    No. No.

Q    "No", okay. You, do you, you, the counsel for Plaintiffs made a statement and you acknowledged it. She said that as a shareholder if the company makes profits, and as a shareholder you benefit from those profits. And I have a series of questions on that. So, is any

62

part of your compensation tied to the sell of a specific product?

A    No.

Q    Okay. Do you receive any commission tied to the sell of any specific product?

A    No.

Q    Do you receive any sort of royalty based on the sell of any specific product that is sold in your stores?

A    No.

Q    Do you, does, do you know if anyone of the partners receive any sort of benefit, bonus, royalty or compensation directly tied to the sell of a specific product?

A    No.

Q    Is there any way, is there any way...? Strike that. Let me just put... So, is there any way to trace the impact in your compensation that derived from the sell of a specific product?

A    No.

Q    Would that be the same answer for Mr. Abadi and for Mr. Shaked?

A    Yes.

Q    Okay. I don't have any further questions.

63

MS. JANE BECKER WHITAKER:

Based on that, I do have one question.

DEPONENT, MR. JOEL BENDER:

Okay.

MS. JANE BECKER WHITAKER:

You benefit from the sale of all of the items sold at Always 99, isn't that correct?

DEPONENT, MR. JOEL BENDER:

Yes.

MS. JANE BECKER WHITAKER:

Okay.

**BY MS. ALEXANDRA C. CASELLAS CABRERA:**

Q    I do have another question. How many, how many products, approximately, how many products do you sell in the stores?

A    Pieces or...?

Q    How different...

A    UPC's?

Q    UPC's.

A    Fifteen thousand, twenty thousands. But, you know, it could be much more. Because during the year you bring in new products. So, a lot.

Q    And each of these, of the plush toys, the *coquí* and the *parrot*, would each have a

64

distinct UPC number or they are placed in the same category?

    A    I don't know.

    Q    You wouldn't know.

    A    No, I mean, I think they would have a different UPC.

    Q    Okay, okay. So, each product, so, you are telling me that overall, you carry about fifteen to twenty thousand different products in your company?

    A    Yeah.

    Q    Okay. So, it would be correct to say that these is a, these two items are just two out of the twenty thousand, is that correct?

    A    Yes.

    Q    Okay. That's fine.

    A    That's it?

MS. JANE BECKER WHITAKER:

    That's it.

COURT REPORTER:

    Okay. Let's go off the record, it's 10:58 a.m.

            ...**END OF THE PROCEEDINGS**...

              ...**OFF THE RECORD**...

    **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

65

**CERTIFICATE OF REPORTER**

I, Sonia Bonet Valentín, Court Reporter,

CERTIFY:

That this is the truthful transcript, to the best of my abilities, of the deposition of Mr. Joel Bender, case number 3:24CV01185 taken on December 3, 2025.

I also certify that I am not involved with any of the parties, nor am I interested directly or indirectly, in the outcome of this matter. IN WITNESS WHEREOF,

I sign the present in San Juan, Puerto Rico this 9th day of February of 2026.

_____
MS. SONIA BONET VALENTÍN,
COURT REPORTER

66

CIVIL NO.: 3:24CV01185    DATE: DECEMBER 3, 2025

**CERTIFICATE OF DEPONENT**

I CERTIFY that I have read the transcript of the deposition that was take of me on the aforementioned case and date.

_____ I have no objections.

_____ I have objections.

_____, Puerto Rico, on the\_\_\_ day of _____2026.


_____
       MR. JOEL BENDER-RABINOICH

List of deponent's objections:


PAGE    LINE    TEXT OF THE TRANSCRIPT    MODIFICATION

_____

_____

_____

_____

_____

_____

NOTE: Changes will be accepted only on errors due to the transcript of the deposition. Changes on what was said by the deponent will not be considered as errors.

67

**CERTIFICATE OF PUBLIC NOTARY**


CERTIFY:


1. That I acted as Public Notary in the above mentioned case.


2. That the deponent was duly sworn by me.


3. That the foregoing is the official transcript of the deposition prepared and submitted by the court reporter.


IN WITNESS WHEREOF, I sign the present and Affix my Notarial Seal, in _____, Puerto Rico, this _____ day of _____ 2026.

_____
MS. JANE BECKER WHITAKER, ESQ.
PUBLIC NOTARY

# EXHIBIT #1

*Exh. 1*
*Dec. 3, 2025*

# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

WE, LLC d/b/a WILD ENCANTOS.,

Plaintiff,

v.

CARIBBEAN RETAIL VENTURES, INC.,
SALVADOR ABADI, Jane Doe, and their
conjugal partnership; JOEL BENDER, Susan
Roe, and their conjugal partnership

Defendants.

Civil No. 3:24-cv-01185 (CVR)

Re: Copyright Infringement

## JOEL BENDER'S ANSWERS AND OBJECTIONS TO PLAINTIFF WE, LLC'S FIRST SET OF INTERROGATORIES

Defendant Joel Bender (hereinafter, "Mr. Bender" or "Defendant"), by and through its undersigned counsel, and pursuant to Federal Rule of Civil Procedure 33, hereby serves its Answers and Objections (the "Answers") to the First Set of Interrogatories ("Interrogatories") propounded by Plaintiff WE, LLC d/b/a "Wild Encantos" ("Plaintiff" or "WE"), and states as follows:

## GENERAL OBJECTIONS

Mr. Bender incorporates in each of its answers the following objections:

1. The word usage and sentence structure are those of Mr. Bender's attorneys.

2. The information supplied in these responses or objections is not based solely on the knowledge of the executing party, but it includes the knowledge of that party's agents and attorneys, unless privileged.

3.    Mr. Bender objects to any definition, instruction, interrogatory or request for production that purports to impose upon the propounded party any obligation not expressly provided for in the Federal Rules of Civil Procedure.

4.    Mr. Bender objects to any definition, instruction or interrogatory that requires the disclosure of information or documents protected by the attorney-client privilege or the work-product or trial-preparation doctrines or that are otherwise protected from disclosure. The inadvertent disclosure of privileged or protected information shall not constitute a waiver of any applicable privilege or protection afforded to such information.

5.    Mr. Bender objects to any interrogatory that requests for the production of any information or documents that contain confidential, trade secrets and/or proprietary information until such time as an appropriate confidentiality agreement is formally executed by the parties.

6.    Mr. Bender's response to any interrogatory, or reference to any document, shall not be deemed to constitute an admission that any particular document exists, is relevant, or is admissible as evidence or that any statement or characterization in Plaintiffs Interrogatory is accurate or complete.

7.    Mr. Bender objects to any interrogatory that seeks documents which are not in his possession, custody or control.

8.    Mr. Bender objects to any interrogatory that seeks documents in a manner or format other than that in which they are maintained in the ordinary course of business, or readily retrievable by Mr. Bender.

9.    In providing specific objections to these interrogatories, Mr. Bender does not in any way waive or intend to waive, but rather intends to preserve and is preserving:

        i. All objections as to the competency, relevancy, materiality and admissibility of these interrogatories, the proposed answers, and their subject;

ii. All objections as to the vagueness, ambiguity or other infirmity in the form of the interrogatory;

iii. All rights to object on any ground to the use of the responses or their subject at any subsequent proceeding, including the trial of this matter, or in any other action;

iv. All rights to object on any ground to any further discovery request involving or regarding this First Set of Interrogatories;

v. The right to supplement responses to the interrogatories or requests for production prior to the trial; and

vi. Any and all privileges or rights under the Federal Rules of Civil Procedure, other statutes, doctrines or common law.

10.    Mr. Bender states that these *General Objections* shall be deemed to be adopted by reference and incorporated into all specific objections set forth herein. To the extent that Mr. Bender provides responses to the specific interrogatory, the stated objections shall not be deemed waived by virtue of the responses provided pursuant to the Federal Rules of Civil Procedure.

## SPECIFIC TERMS AND DEFINITIONS

### DEFINITIONS

The following definitions are incorporated by reference in all of Mr. Bender's specific responses and objections to Plaintiffs *First Set of Interrogatories*:

1.    "*Irrelevant*" means not relevant to the issues involved in the pending action and not reasonably calculated to lead to the discovery of evidence admissible as to those issues.

2.    "*Impermissibly Overbroad*" means irrelevant, burdensome, and unnecessary to the extent that the Interrogatory seeks: (1) information about individuals or entities not parties to this action; and/or (2) information pertaining to persons, activities, and/or events that are outside the scope of the present litigation.

3

3.     *"Vague"* means ambiguous, unintelligible, uncertain, liable to more than one interpretation, or not specified with reasonable particularity.

4.     *"Unduly burdensome"* and/or *"oppressive"* means that: (1) it is impossible to respond to the interrogatory in a complete and sufficient manner without making a complex or onerous investigation; (2) the response to the interrogatory requires seeking a collection or reproduction of document or information which is financially burdensome or unfeasible; or (3) the response or information sought has been previously produced to a party within this action and served upon every attorney involved in this litigation.

5.     *"Plaintiff"* means WE, LLC d/b/a "Wild Encantos".

6.     " *CRV*" means Caribbean Retail Ventures, Inc.

## ANSWERS AND OBJECTIONS TO INTERROGATORIES

**Interrogatory No. 1:** Identify any and/all person(s) who provided, supplied or assisted information responsive to the questions posed in these discovery requests, including name, address, e-mail, telephone number, workplace and job title, including a brief description of their knowledge.

**ANSWER:** The person who provided, supplied or assisted information to the questions posed in these discovery requests was Joel Bender. Mr. Bender is the Vice-President of CRV with business address at Gautier Benitez Street No. 14, Caguas, Puerto Rico 00725 and he can be contacted through Counsel.

Mr. Bender's is primarily responsible for overseeing and directing purchasing decisions for locally sourced merchandise. While he may be involved in limited purchasing decisions for certain externally sourced products, he does not participate in or have any responsibility for purchasing decisions related to the plush merchandise category. His duties do not extend to evaluating, selecting, or negotiating with vendors or suppliers in that specific category, and he has no involvement in day-to-day procurement activities relating to plush items.

**Interrogatory No. 2** Identify every person with knowledge of the relevant facts of the case and summarize each person(s) knowledge and opinions, including name, address, e-mail, telephone number, workplace, and job title.

**ANSWER:** Mr. Bender objects to *Interrogatory No. 2* on the grounds that it is overly broad and unduly burdensome. The request seeks for the identity of every

4

person with knowledge of the relevant facts of the case and a summary of their knowledge and opinions.

Subject to and without waiving the foregoing objections, Mr. Bender refers the Plaintiff to "Defendants Fed. R. Civ. P. 26 (a)(1) Initial Disclosures", which were served electronically on Plaintiff on March 21, 2025.

**Interrogatory No. 3**: Identify all persons and/or entities that have possession, custody, or control of materials relevant to this case and the materials over which they have possession, custody and/or control including name, address, e-mail, telephone number, workplace and job title.

**ANSWER**: Mr. Bender objects to *Interrogatory No. 3* on the grounds that it is overbroad and unduly burdensome to the extent that it requests Mr. Bender to identify "all persons and/or entities that have possession, custody or control of materials relevant to this case". Additionally, the request is premature, as discovery is in its early stages and Mr. Bender has not yet identified all relevant evidence.

Subject to and without waiving the foregoing objections, Mr. Bender refers the Plaintiff to "Defendants Fed. R. Civ. P. 26 (a)(1) Initial Disclosures", which were served electronically on WE on March 21, 2025.

**Interrogatory No. 4**: Please state your opinions and contentions about your legal theories for each of your defense(s) stated by you on the on your answer to the complaint in relation to the applications of the law to the facts in this case and/or the allegations in the complaint.

**ANSWER**: Mr. Bender objects to *Interrogatory No. 4* on the grounds that it improperly seeks legal conclusions and opinions from a non-lawyer witness. A lay witness may testify only to facts within his personal knowledge, not to the application of law to fact or his "legal theories," which are matters reserved to counsel and the Court.

Subject to and without waiving the foregoing objections, Mr. Bender refers Plaintiff to the "Joint Proposed Scheduling Memorandum" filed on March 5, 2025 at ECF No. 55 and to Defendants' Motion to Dismiss and motions in support thereof, at ECF No. 43 and 51.

**Interrogatory No. 5:** Please indicate your relationship with Caribbean Retail Ventures.
  a) If you are an employee, please indicate the terms of your employee and specify the date when you began as an employee.
  b) If you have a contract with CRT, please provide a copy and if the contract is not written, indicate the terms of the agreement.
  c) Specify how profits are distributed to the owners of CRV, including but not limited to dividends and profit sharing; and
  d) Provide copies of any and all documents and materials including but not limited to e-mails, contracts, licenses, memos, independent contractor agreements, and communications, regarding the how you are compensated for your work for Caribbean Retail Ventures.

5

**ANSWER:** Defendant objects to *Interrogatory No. 5*, including subparts (a) through (d), on the grounds that it is overly broad, unduly burdensome, seeks irrelevant information, and is not proportional to the needs of the case under Fed. R. Civ. P. 26(b)(1).

The interrogatory improperly seeks detailed personal, employment, contractual, and financial information that has no bearing on the claims or defenses in this copyright and trademark infringement action.

Defendant further objects to the extent that the interrogatory seeks confidential and proprietary business information and private financial information, the disclosure of which is not justified in this litigation and could cause undue harm to Defendant and/or Caribbean Retail Ventures.

Defendant further objects to the extent that the interrogatory seeks documents and communications protected by the attorney-client privilege, the attorney work-product doctrine, or otherwise constitutes confidential commercial information not subject to disclosure without appropriate safeguards.

Subject to and without waiving the foregoing objections, Defendant states that he is the Vice President of CRV. CRV operates the Always 99 stores in Puerto Rico. Please refer to Mr. Bender's Answer to *Interrogatory No. 1* for an explanation of his role in the company. Furthermore. Mr. Bender does not personally direct the purchasing of plush toys at issue. Any profits generated by CRV are corporate profits retained by the company, and any distributions, if any, are made at the discretion of CRV's board and not tied to the sale of specific products.

**Interrogatory No. 6:** Please describe your decisional authority at Caribbean Retail Ventures. In particular, what is your participation in the decision as to what products to sell, in particular new products.

**ANSWER:** Defendant objects to *Interrogatory No. 6* to the extent it seeks information that is irrelevant, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly in a copyright infringement action where the relevant inquiry for vicarious liability is whether the defendant had a direct right and ability to supervise the specific alleged infringing activity and a direct financial interest in such activity.

Defendant further objects to the extent the Interrogatory is vague as to the term "decisional authority."

Subject to and without waiving the foregoing objections, Defendant states that, as Vice President of CRV Mr. Bender participates in and directs certain purchasing decisions for CRV, particularly with respect to locally sourced products

6

and externally sourced everyday items, such as garbage bags, paper towels, and toilet paper. While he is involved in the procurement of such general inventory, he does not participate in day-to-day purchasing decisions for specific merchandise categories, including plush products. Mr. Bender has no involvement in evaluating, selecting, or approving plush toys, whether sourced internally or externally. Purchasing decisions for plush and similar merchandise are made by designated buyers and operational managers at CRV, without Mr. Bender's input or approval

**Interrogatory No. 7**: How frequently do you travel outside of Puerto Rico? In particular, how frequently do you use the SJU airport? Please provide supporting documents, such as tickets.

**ANSWER**: Defendant objects to *Interrogatory No. 7* on the grounds that it seeks information that is irrelevant, immaterial, overly broad, unduly burdensome, and not proportional to the needs of the case under Fed. R. Civ. P. 26(b)(1).

Defendant further objects because the Interrogatory improperly invades the Defendant's personal privacy and seeks confidential information without any showing of relevance to the claims or defenses at issue in this copyright infringement action.

Defendant additionally objects to the request for "supporting documents" such as travel tickets, as it constitutes an improper and overly broad request for document production within an interrogatory, and seeks information protected by privacy rights.

Subject to and without waiving the foregoing objections, Defendant states that Mr. Bender's personal travel, including travel frequency and use of the SJU airport, has no bearing on the selection, purchase, or sale of the plush toys at issue, nor on the allegations of copyright infringement asserted in the Amended Complaint. Accordingly, no responsive documents are being produced.

**Interrogatory No. 8:** Please indicate how you keep up to date as to what products your competitors are selling.

**ANSWER**: Defendant objects to Interrogatory No. 8 on the grounds that it is vague, ambiguous, overly broad, unduly burdensome, and not limited to any specific time frame.

Defendant further objects to the Interrogatory because the terms "products" and "competitors" are undefined, rendering the request unclear and susceptible to multiple interpretations.

Defendant also objects on the grounds that the Interrogatory seeks information that is irrelevant and not proportional to the needs of the case under Fed. R. Civ. P. 26(b)(1), particularly given that this is a copyright infringement

7

action concerning specific plush toys, and not a case involving competitive market analysis or business strategy.

Subject to and without waiving the foregoing objections, Defendant states that, in his role as Vice President of CRV, Mr. Bender does not monitor competitors in a formalized manner related to the purchase or sale of plush toys at issue in the Amended Complaint.

**Interrogatory No. 9:** Identify all persons who you will use as witnesses in the case. To that effect please provide:
   a) name, address, email, telephone number, company positions held since working at Caribbean Retail Ventures;
   b) a brief description of their knowledge regarding the allegations in the Amended complaint.

**ANSWER:** Mr. Bender objects to *Interrogatory No. 9* on the grounds that discovery is still in the early stages and the request is premature, as it has not yet determined all witnesses it will call or may call to give testimony during the trial. In due course, Mr. Bender will disclose to the Plaintiff the identity of its proposed witnesses in compliance with Fed. R. Civ. P. 26(a)(1). Subject to, and without waiving the foregoing objection, Mr. Bender refers the Plaintiff to the Initial Disclosures served electronically on March 21, 2025.

**Interrogatory No. 10:** Please state the nature and extent of all liability insurance coverage of every kind available directly or indirectly to you to pay any judgment awarded in this action and include the name or names of each insurance company and the applicable limits of liability insurance in effect for each entity and/or occurrence.
   a) If there was more than one policy of insurance applicable in this instance, identify each insurance company as indicated above and state which liability insurance company is the primary insurance carrier and identify any and all self-insurance, secondary, reserve and /or umbrella liability insurance carriers, if any
   b) Attach a copy of the coverage/declaration sheet from each such liability insurance company setting forth all the available limits of coverage applicable to this occurrence.

**ANSWER:** Mr. Bender states that after a reasonable search he has found no liability insurance coverage – either directly or indirectly assigned to him to satisfy any judgment award in this action. This response is provided based on currently available information and Mr. Bender reserves the right to supplement or amend this response as additional facts become known through the discovery process.

**Interrogatory No. 11:** Identify the name of any expert witness that you plan to hire and/or use in this case, including its preparation, nature of his/her testimony, description of its expert report and which documents he/her will use at trial. Provide all the Rule 26 information for each expert.

**ANSWER:** Mr. Bender objects to *Interrogatory No. 11* on the grounds that discovery is still in the early stages and the request is premature, as it has not yet retained, consulted or employed any expert in anticipation of litigation or

8

preparation for trial. In due course, Mr. Bender will disclose to the Plaintiff the identity of its proposed experts witnesses and his/her reports  in compliance with Fed. R. Civ. P. 26(a)(2).

**WE HEREBY CERTIFY:** that on this same date *Joel Bender's Answers and Objections to Plaintiff WE, LLC's First Set of Interrogatories* was delivered to Plaintiff's counsel via electronic mail at their electronic address of record.

In San Juan, Puerto Rico, this 7th day of May, 2025.

**ADSUAR**
*Counsels for Joel Bender*
P.O. Box 70294
San Juan, PR 00936-8294
Tel.: 787.756.9000/Fax: 787.756.9010

*/s/ Luis Perez-Giusti*
LUIS PEREZ-GIUSTI
USDC-PR 208608
lpg@amgprlaw.com

*/s/ Alexandra Casellas Cabrera*
ALEXANDRA CASELLAS CABRERA
USDC-PR 301010
acasellas@amgprlaw.com

9

## VERIFICATION STATEMENT

I, Joel Bender, Vice-President of Caribbean Retail Ventures Inc., believe based on reasonable inquiry, that the foregoing answers are true and correct to the best of my knowledge, information, and belief.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on April 30, 2025.

_s/ Joel Bender_
Joel Bender
Vice-President of CRV

10

# EXHIBIT #2

Exh. 2
Dec. 3, 2025

# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| WE, LLC d/b/a WILD ENCANTOS., | Civil No. 3:24-cv-01185 (CVR) |
| Plaintiff, | |
| v. | Re: Copyright Infringement |
| CARIBBEAN RETAIL VENTURES, INC., SALVADOR ABADI, Jane Doe, and their conjugal partnership; JOEL BENDER, Susan Roe, and their conjugal partnership | |
| Defendants. | |

## DEFENDANTS' FED.R.CIV. P. 26(a)(1) INITIAL DISCLOSURES

Pursuant to Fed.R.Civ.P. 26(a)(1) Caribbean Retail Ventures, Inc. ("CRV"); Salvador Abadi, his spouse, and their conjugal partnership; and Joel Bender, his spouse, and their conjugal partnership (collectively, with CRV the "Defendants"), make the following disclosures:

## INTRODUCTORY STATEMENT

The following disclosures are made based upon the information reasonably available to Defendants as of the date hereof. By making these disclosures, Defendants do not represent that it is identifying every document, tangible thing or witness possibly relevant to this lawsuit. Nor do Defendants waive their right to object to the production of any document or tangible thing disclosed herein on the basis of any privilege, the work product doctrine, relevancy, undue burden, or any other valid objection or to object to the introduction into evidence of any such document or tangible thing. Instead, Defendant's disclosures represent a good faith effort to identify information it reasonably believes it may use to support its claims, unless solely for impeachment as required by Fed.R.Civ.P. 26(a)(1).

Further, Defendant's disclosures are made without in any way waiving: (1) the right to object on the grounds of competency, privilege, relevancy, materiality, hearsay, or any other proper ground, to the use of any such information for any purpose, in whole or in part, in any subsequent proceeding in this action or any other action; (2) the right to seek appropriate restrictions or limitations on the distribution and use of any such information; and (3) the right to object on any and all grounds, at any time, to any other discovery request or proceeding involving or relating to the subject matter of these disclosures. Finally, Defendant's reserve its right to supplement and change these disclosures as discovery develops. Accordingly, all of the disclosures set forth below are made subject to the above limitations and qualifications.

**Fed. R.Civ.P. 26 (a)(1):**

(A)(i) **Individuals Likely to Have Discoverable Information:** In the parties' *Joint Case Memorandum* ("ISC Memo") filed on March 5, 2025 (Dkt. No. 55 at 25-26), Defendant's preliminarily identified its potential witnesses as of the filing of the memo, including the topics on which they may testify. Notwithstanding and subject to further amendments given that discovery has not yet begun, below Defendant's disclose individuals likely to have discoverable information in connection with the above-captioned matter:

1. Salvador Abadi

2. Joel Bender

3. Alon Shaked

4. Alines Ayala

All of them can be contacted through defendants' counsel and at Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725.

2

Defendants reserve the right to supplement this list as necessary during the discovery process.

### (A)(ii)  Documents Defendants May Use to Support its Claims:

Subject to further amendments given that discovery has not yet begun, below is a categorical description of the documents:

| Category | Location | Document Description |
|---|---|---|
| **Importation & Customs Compliance** | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>\*\*\*<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Entry Summary - U.S. Customs and Border Protection (March 3, 2022). Official customs document certifying the importation of packages of plush toys, providing details on their entry into Puerto Rico. |
| **Importation & Customs Compliance** | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>\*\*\*<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Entry Summary - U.S. Customs and Border Protection (February 15, 2024). Official customs document certifying the importation of packages of plush toys, providing details on their entry into Puerto Rico. |
| **Importation & Customs Compliance** | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>\*\*\*<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Declaration of Import – Puerto Rico Department of Treasury (Hacienda) (February 8, 2024: An official import declaration for CRV issued by the Puerto Rico Department of Treasury, detailing taxable goods valued at $56,382.48 and total taxes due of $5,920.16. |

| Category | | Location | Document Description |
|---|---|---|---|
| **Importation & Customs Compliance** | | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>\*\*\*<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Declaration of Import – Puerto Rico Department of Treasury (Hacienda) (February 7, 2023: An official import declaration for CRV issued by the Puerto Rico Department of Treasury, detailing taxable goods valued at $62,620.80 and total taxes due of $6,575.18. |
| **Importation & Customs Compliance** | | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>\*\*\*<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Declaration of Import – Puerto Rico Department of Treasury (Hacienda) (February 2022): An official import declaration for CRV issued by the Puerto Rico Department of Treasury, detailing taxable goods valued at $58,358.40 and total taxes due of $6,127.63. |
| **Importation & Customs Compliance** | | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>\*\*\*<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Release Authorization – Puerto Rico Department of Treasury, Internal Revenue Area (February 7, 2023): A document issued by the P.R. Dept. of Treasury, authorizing the release of the imported goods for CRV. It confirms the declaration date of February 7, 2023, and the introduction date of January 21, 2023. |
| **Importation & Customs Compliance** | | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>\*\*\*<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Release Authorization – Puerto Rico Department of Treasury, Internal Revenue Area (February 7, 2023): A document issued by the P.R. Dept. of Treasury, authorizing the release of the imported goods for CRV. It confirms the declaration date of February 24, 2022, and the introduction date of February 16, 2022. |

4

| Category | Location | Document Description |
|---|---|---|
| **Importation & Customs Compliance** | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>\*\*\*<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Release Authorization – Puerto Rico Department of Treasury, Internal Revenue Area (February 8, 2024): A document issued by the P.R. Dept. of Treasury, authorizing the release of the imported goods for CRV. It confirms the declaration date of February 8, 2024, and the introduction date of February 4, 2024. |
| **Importation & Customs Compliance** | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>\*\*\*<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Entry Summary – U.S. Customs and Border Protection (February 3, 2023).A customs entry summary issued by the U.S. Department of Homeland Security, documenting the import of goods into Puerto Rico. The entry date is recorded as January 23, 2023. |
| **Commercial Documentation and Invoicing** | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>\*\*\*<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Invoice – Homerbest Manufacturing Company Limited to CRV (Caguas, Puerto Rico). An invoice issued by Homerbest Manufacturing Company Limited that details the purchase of plush toys from Shanghai, China to San Juan, Puerto Rico. It specifies quantities, unit prices, and the total amounts for the items purchased. |
| **Commercial Documentation and Invoicing** | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>\*\*\*<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Packing List – Homerbest Manufacturing Company Limited (November 23, 2023) A packing list detailing the items shipped from Guangzhou, China to CRV in Caguas, Puerto Rico. This document provides a complete itemization of the products and the number of cartons included in the shipment. |

| Category | Location | Document Description |
|---|---|---|
| Commercial Documentation and Invoicing | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>***<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Packing List – Homerbest Manufacturing Company Limited (November 21, 2022) A packing list detailing the items shipped from Guangzhou, China to CRV in Caguas, Puerto Rico. This document provides a complete itemization of the products and the number of cartons included in the shipment. |
| Commercial Documentation and Invoicing | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>***<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Packing List – Homerbest Manufacturing Company Limited (48 Cartons – Plush Toy Coquí and Plush Toy Cotorra). A separate packing list that specifically outlines the contents of the shipment comprising 48 cartons of plush toys (Coquí and Cotorra varieties). |
| Commercial Documentation and Invoicing | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>***<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Packing List – Homerbest Manufacturing Company Limited (November 21, 2022): A detailed packing list from Homerbest Manufacturing Company Limited, documenting the shipment of 48 cartons of plush toys (Coquí and Cotorra) from China to CRV in Caguas, Puerto Rico. |
| Commercial Documentation and Invoicing | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>***<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Packing List – Homerbest Manufacturing Company Limited (January 10, 2022): A detailed packing list from Homerbest Manufacturing Company Limited, documenting the shipment of 48 cartons of plush toys (Coquí and Cotorra) from China to CRV in Caguas, Puerto Rico. |

6

| Category | Location | Document Description |
|---|---|---|
| Commercial Documentation and Invoicing | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>***<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | CRV Spreadsheet from 10/1/2023 to 3/31/2024. This document provides a detailed sales report for CRV, covering the period from October 1, 2023, to March 31, 2024. It includes itemized data on the sell-through performance of two plush toys, the Puerto Rico Plush Cotorra and Puerto Rico Plush Coqui, supplied by Homerbest. The report outlines unit costs, retail prices, landed costs, total units sold, and total revenue. The overall sell-through rate for both products is 43.84%, with total retail revenue of $11,754.54 and a landed cost of $4,985.79. |
| Logistics and Transportation | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>***<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Bill of Lading – Evergreen Line: A shipping document that evidences the shipment of plush toys from China to Puerto Rico. It identifies Homerbest Manufacturing as the exporter, CRV as the consignee, and includes an order to Banco Popular de Puerto Rico (via 71 Forwarding Agent CRV). The document is stamped with the shipping date (February 5, 2024). |
| Logistics and Transportation | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>***<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Transportation Invoice – A. Torres Transport (February 9, 2024): A transportation invoice documenting the local shipment of general cargo, including the plush toys, within Puerto Rico. It specifies the date of transport and identifies A. Torres Transport as the responsible carrier. |

7

| Category | Location | Document Description |
|---|---|---|
| **Logistics and Transportation** | CRV<br>Calle Gautier Benitez No. 14,<br>Caguas, Puerto Rico 00725<br>***<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Transportation Invoice – A. Torres Transport (February 8, 2023): A transportation invoice documenting the general cargo shipment within Puerto Rico by A. Torres Transport, specifying the date and the nature of the goods transported. |
| **Logistics and Transportation** | CRV<br>Calle Gautier Benitez No. 14,<br>Caguas, Puerto Rico 00725<br>***<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Transportation Invoice – A. Torres Transport (February 25, 2022): A transportation invoice documenting the general cargo shipment within Puerto Rico by A. Torres Transport, specifying the date and the nature of the goods transported. |
| **Logistics and Transportation** | CRV<br>Calle Gautier Benitez No. 14,<br>Caguas, Puerto Rico 00725<br>***<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Bill of Lading – Evergreen Line (Paid Stamp – February 7, 2023):A shipping document confirming the transport of goods from Homerbest Manufacturing Company Limited to CRV in Caguas, Puerto Rico. The shipment consisted of 723 cartons, with a total cost of $5,187.00. |
| **Cost Breakdown & Financial Assessment** | CRV<br>Calle Gautier Benitez No. 14,<br>Caguas, Puerto Rico 00725<br>***<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Invoice – Homerbest Manufacturing Company Limited to CRV (November 24, 2023): An invoice from Homerbest Manufacturing Company Limited to CRV, listing the purchase of plush toys:<br><br>Plush Toy Cotorra: Invoice amount of $5,400 with a duty tax of $41.74.<br><br>Plush Toy Coquí: Invoice amount of $4,680 with a duty tax of $36.17. |

8

| Category | Location | Document Description |
|---|---|---|
| Cost Breakdown & Financial Assessment | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>***<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Invoice — Homerbest Manufacturing Company Limited to CRV (November 21, 2022): An invoice from Homerbest Manufacturing Company Limited to CRV, listing the purchase of plush toys:<br><br>Plush Toy Cotorra: 4,560 units for a total of $6,840.00<br>Plush Toy Coquí: 2,305 units for a total of $3,456.00 |
| Cost Breakdown & Financial Assessment | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>***<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Invoice — Homerbest Manufacturing Company Limited to CRV (January 10, 2022): An invoice from Homerbest Manufacturing Company Limited to CRV, listing the purchase of plush toys:<br><br>Plush Toy Cotorra: 3,600 units for a total of $5,400.00<br>Plush Toy Coquí: 3,120 units for a total of $4,680 |
| Cost Breakdown & Financial Assessment | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>***<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Landed Costs: A financial document detailing the total landed costs associated with the plush toy importation. It includes unit costs of $1.50 for both the Plush Toy Coquí and Plush Toy Cotorra, as well as other expenses such as ocean freight. |

| Category | Location | Document Description |
|---|---|---|
| Cost Breakdown & Financial Assessment | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>***<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Landed Costs: A financial document detailing the total landed costs associated with the plush toy importation. It includes unit costs of $1.50 for both the Plush Toy Coquí and Plush Toy Cotorra, as well as other expenses such as ocean freight. |
| Cost Breakdown & Financial Assessment | CRV<br>Calle Gautier Benitez No. 14, Caguas, Puerto Rico 00725<br>***<br>Adsuar<br>Popular Center Building<br>208 Ponce de León Ave.<br>Suite 1600<br>San Juan, PR 00918<br>(787) 756-9000 | Landed Costs: A financial document detailing the total landed costs associated with the plush toy importation. It includes unit costs of $1.50 for both the Plush Toy Coquí and Plush Toy Cotorra, as well as other expenses such as ocean freight. |

### (A)(iii)  Computation of Damages:

Not applicable. WE, LLC has made no claim for damages.

### (A)(iv)  Insurance Agreement:

To date, Defendants have not identified an insurance policy that would cover the claims asserted by Plaintiff in its *Amended Complaint*.

### (A)(v)  Expert witness

Defendants have not made a decision with regards to an expert witness. Defendants will wait for discovery to be conducted and/or whether plaintiff will use an expert witness at trial.

Please contact the undersigned should you have any further question regarding this matter.

10

In San Juan, Puerto Rico, on this 21st day of March 2025.

**ADSUAR**
*Counsel for the Defendants*
P.O. Box 70294
San Juan, PR 00936-8294
Tel.: 787.756.9000
Fax: 787.756.9010


*/s/Luis Perez-Giusti*
LUIS PEREZ GIUSTI
USDC-PR No. 208608
*lpg@amgprlaw.com*


*/s/ Alexandra Casellas Cabrera*
ALEXANDRA CASELLAS CABRERA
USDC-PR 301010
acasellas@amgprlaw.com

11

# EXHIBIT #3



Gobierno de Puerto Rico
Departamento de Estado

Fecha de la Transacción: 15-abr.-2023
Núm. Registro: 109447
Núm. Recibo: 28270672



## INFORME ANUAL 2022

### Información General

| | |
|---|---|
| Núm. Registro | **109447** |
| Nombre | **CARIBBEAN RETAIL VENTURES, INC.** |
| Fecha de Inscripción | **28-Oct-1999** |
| Jurisdicción | **Doméstica** |

| | |
|---|---|
| Clase | **Corporación** |
| Tipo | **Con Fines de Lucro** |

### Persona Autorizada

| | |
|---|---|
| Nombre | **Abadi , Salomón J** |
| Dirección | **14 Calle Gautier Benitez CAGUAS PR 00725** |

### Dirección Oficina Designada

| | |
|---|---|
| Dirección Física | **14 GAUTIER BENITEZ, CAGUAS, Puerto Rico, 00725** |
| Dirección Postal | **14 GAUTIER BENITEZ, CAGUAS, Puerto Rico, 00725** |
| Teléfono | **(787) 743-5598** |

### Agente Residente

| | |
|---|---|
| Nombre | **ABADI , SALOMON** |
| Dirección Física | **GAUTIER BENITEZ 14, CAGUAS, PR, 00725** |
| Dirección Postal | **GAUTIER BENITEZ 14, CAGUAS, PR, 00725** |

### Oficiales

El nombre, título, expiración cargo y dirección postal de los oficiales son:

| | |
|---|---|
| Nombre: | **ABADI , SALOMON J** |
| Título(s): | **Presidente** |
| Expiración Cargo: | **Indefinido** |
| Dirección Postal: | **14 GAUTIER BENITEZ CAGUAS PR 00725** |

| | |
|---|---|
| Nombre: | **SHAKED , ALON** |
| Título(s): | **Secretario(a)** |
| Expiración Cargo: | **Indefinido** |
| Dirección Postal: | **14 GAUTIER BENITEZ CAGUAS PR 00725** |

| | |
|---|---|
| Nombre: | **BENDER , JACOBO** |
| Título(s): | **Tesorero(a)** |

| | |
|---|---|
| Expiración Cargo: | **Indefinido** |
| Dirección Postal: | **14 GAUTIER BENITEZ CAGUAS PR 00725** |
| Nombre: | **BENDER , JOEL** |
| Título(s): | **Vicepresidente** |
| Expiración Cargo: | **Indefinido** |
| Dirección Postal: | **14 GAUTIER BENITEZ CAGUAS PR 00725** |

### Estado Financiero

Estado Financiero Añadido Detalles provistos en Estado de Situación          **2022_109447-111_FS_UN_1_DE438EEB.pdf**

Volumen Negocios de la Entidad    **Entidad excede los $3,000,000**

¿La entidad pertenece a un grupo de entidades relacionadas?
**Si**

¿El volumen de negocio del grupo de entidades es igual o mayor a 10 millones de dólares?
**Si**

### CERTIFICACIÓN JURADA
EN TESTIMONIO DE LO CUAL, ALON SHAKED (Secretario(a)) declaramos que la información contenida en este Informe Anual es correcta. Hoy, 15 de abril de 2023.

# EXHIBIT #4

*Exh. 4*
*Dec. 3, 2025*

**AUDITED BALANCE SHEETS**
CARIBBEAN RETAIL VENTURES, INC.
Years Ended September 30, 2023, and 2022

SHARON & GONZALEZ, LLC | CERTIFIED PUBLIC ACCOUNTANTS & BUSINESS CONSULTANTS

2

CONTENTS

Report of Independent Auditors ........................................................................................ 3
Balance Sheets.................................................................................................................... 5
Notes to Balance sheets .................................................................................................... 6

Member of American Institute of Certified Public Accountants
Member of Puerto Rico Society of Certified Public Accountants



**SHARON & GONZALEZ, LLC**
CERTIFIED PUBLIC ACCOUNTANTS & BUSINESS CONSULTANTS
A Leading Edge Alliance Firm

## REPORT OF INDEPENDENT AUDITORS

To the Board of Directors and Stockholder
**Caribbean Retail Ventures, Inc.**
Caguas, Puerto Rico

### Opinion

We have audited the accompanying balance sheets of **Caribbean Retail Ventures, Inc.**, which comprise the balance sheets as of September 30, 2023, and 2022, and the related notes to the balance sheets.

In our opinion, the balance sheets referred to above present fairly, in all material respects, the financial position of **Caribbean Retail Ventures, Inc.**, as of September 30, 2023, and 2022, in accordance with accounting principles generally accepted in the United States of America.

### Basis for Opinion

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Balance sheets section of our report. We are required to be independent of **Caribbean Retail Ventures, Inc.**, and to meet our other ethical responsibilities in accordance with the relevant ethical requirements relating to our audit. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### Effect of Adopting New Accounting Standard

As discussed in Note 1, New Accounting Pronouncements the Financial Accounting Standards Board issued ASU No. 2016-02, *Leases (Topic 842)*, which supersedes accounting standards that currently exist under GAAP and require leases to be recorded as an asset on the balance sheet for the right to use the leased asset and a liability for the corresponding lease obligation for leases with terms of more than twelve months. ASU 2016-02 is effective for non-public companies for fiscal years beginning after December 15, 2022, with early adoption permitted.

The standard also requires companies to disclose additional information, including cash flow information, average term of the leases and implicit rates used in the capitalization of the leases. The Company has not yet selected a transition method, nor has it determined the effect of the standard on its balance sheets. Our opinion is not modified with respect to that matter.

### Responsibilities of Management for the Balance Sheets

Management is responsible for the preparation and fair presentation of the balance sheets in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of balance sheets that are free from material misstatement, whether due to fraud or error.

In preparing the balance sheets, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about **Caribbean Retail Ventures, Inc.'s** ability to continue as a going concern within one year after the date that the balance sheets are available to be issued.

**Auditor's Responsibilities for the Audit of the Balance Sheets**

Our objectives are to obtain reasonable assurance about whether the balance sheets as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion.

Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with generally accepted auditing standards will always detect a material misstatement when it exists.

The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the balance sheets.

In performing an audit in accordance with generally accepted auditing standards, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.

- Identify and assess the risks of material misstatement of the balance sheets, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the balance sheets.

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of **Caribbean Retail Ventures, Inc.'s** internal control. Accordingly, no such opinion is expressed.

- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the balance sheets.

- Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about **Caribbean Retail Ventures, Inc.'s** ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control related matters that we identified during the audit.

*Sharon & Gonzalez, LLC*

San Juan, Puerto Rico
April 19, 2024

5

### CARIBBEAN RETAIL VENTURES, INC.
BALANCE SHEETS

| | September 30 | |
|---|---|---|
| | 2023 | 2022 |
| **Assets** | | |
| **Current assets** | | |
| Cash | $ 14,249,000 | $ 11,272,014 |
| Due from related companies | 4,132,779 | 3,802,590 |
| Inventory | 13,592,334 | 12,964,351 |
| Investment in marketable debt securities | 65,941 | 83,328 |
| Prepaid expenses | 436,987 | 869,972 |
| Total current assets | 32,477,041 | 28,992,255 |
| | | |
| **Property and equipment, net** | | |
| Furniture and fixtures | 6,961,030 | 6,340,324 |
| Leasehold improvements | 7,362,320 | 7,059,203 |
| Vehicles | 561,912 | 220,487 |
| Software programs and licenses | 134,014 | - |
| Assets under construction | - | 107,943 |
| | 15,019,276 | 13,727,957 |
| Less accumulated depreciation and amortization | ( 9,972,806) | ( 8,810,272) |
| | 5,046,470 | 4,917,685 |
| | | |
| **Other assets** | | |
| Deposits | 2,550 | 550 |
| Total assets | $ 37,526,061 | $ 33,910,490 |
| | | |
| **Liabilities and Stockholders' equity** | | |
| **Current liabilities** | | |
| Current maturities of long-term debt | $      238,762 | $        - |
| Current lease liabilities – financing | 68,061 | |
| Non-revolving note payable | - | 1,574,503 |
| Accounts payable trade | 12,913,054 | 11,006,752 |
| Accruals and other liabilities | 474,750 | 1,045,406 |
| Income taxes payable | 293,090 | 380,571 |
| Total current liabilities | 13,987,717 | 14,007,232 |
| | | |
| **Long-term liabilities** | | |
| Lease liabilities – financing | 198,234 | - |
| Long-term debt | 1,882,402 | - |
| | 2,080,636 | - |
| Total liabilities | 16,068,353 | 14,007,232 |
| | | |
| **Stockholders' equity** | | |
| Common stock, par value of $10, 100,000 shares authorized and 30,000 issued and outstanding | 300,000 | 300,000 |
| Treasury stock at cost | ( 2,700,000) | ( 2,400,000) |
| Accumulated other comprehensive income from unrealized loss on investment securities available for sale | (          813) | (      23,475) |
| Retained earnings | 23,858,521 | 22,026,733 |
| Total stockholders' equity | 21,457,708 | 19,903,258 |
| Total liabilities and stockholders' equity | $ 37,526,061 | $ 33,910,490 |

See accompanying notes.

6

**CARIBBEAN RETAIL VENTURES, INC.**
NOTES TO BALANCE SHEETS
September 30, 2023, and 2022

## 1. Summary of the Business and Significant Accounting Policies

A summary of the significant accounting policies consistently applied in the preparation of the accompanying balance sheets follows:

### Business Activity

The Caribbean Retail Ventures, Inc., (hereafter the Company) was organized on October 28, 1999, under the laws of the Commonwealth of Puerto Rico. The Company is a retailer of miscellaneous merchandise.

### Basis of Accounting

The balance sheets are prepared in accordance with accounting principles generally accepted in the United States of America. The basis of accounting involves the application of accrual basis of accounting; consequently, revenues and gains are recognized when earned and have high probability of collection. Expenses and losses are recognized when incurred.

### Use of Estimates

The preparation of balance sheets in conformity with generally accepted accounting principles in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the balance sheets and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

### Inventory

Inventory is valued at the retail inventory method, first-in, first-out method.

### Investment in Marketable Debt Securities

The Company accounts for its investment in marketable debt securities in accordance with financial standards for investment securities. Securities classified as held-to-maturity are stated at cost adjusted for amortization of premiums and accretion of discounts. Held-to-maturity securities are those for which the Company have the positive intent and ability to hold through maturity.

Securities classified as available-for-sale may be sold in response to changes in interest rates, liquidity needs and for other purposes. Available-for-sale securities are carried at fair value and include all debt securities not classified as held-to-maturity or trading. Trading securities are those held principally for the purpose of selling in the near future and are carried at fair value.

The Company classified all of its debt securities as available for sale. The Company does not currently have any trading or held to maturity securities.

Unrealized holding gains and losses for available-for-sale securities are excluded from earnings and reported, as a separate component of shareholders' equity. Realized gains and losses for securities are reported in earnings on the adjusted cost of the specific security sold.

If available, quoted market price is used to value investments. Purchases and sales of securities are recorded in trade date basis. Interest income is recorded on accrual basis. Dividends are recorded on the extraction dividend rate. Realized gains and losses for securities classified as available for sale are included in earnings and are determined using the specific-identification method.

7

**CARIBBEAN RETAIL VENTURES, INC.**
NOTES TO BALANCE SHEETS
September 30, 2023, and 2022

## 1. Summary of the Business and Significant Accounting Policies (continued)

### Fair Value Measurements

In accordance with ASC 820, *Fair Value Measurements and Disclosures*, the Company has implemented the full provisions of fair value measurement. ASC 820 establishes a guideline for measuring fair value. Fair value is the proceeds that would be received from selling and asset or paid to transfer a liability in an orderly transaction in the most advantageous market for an asset or liability between market participants at the measurement date. The guidelines provide a fair value hierarchy which prioritizes the inputs to valuation techniques used to measure fair value. This hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets and liabilities (Level 1 measurements) and the lowest priority to unobservable inputs (Level 3 measurements). The three levels of the fair value hierarchy under ASC 820 are described as follows:

Level 1 Inputs – Quoted prices for identical assets and liabilities in active markets.

Level 2 Inputs – Observable inputs other than quoted prices in active markets which may include quoted prices for similar assets or liabilities.

Level 3 Inputs – Inputs that are generally unobservable and typically reflect management's estimates of assumptions that market participants would use in pricing the asset or liability.

In January 2010, the FASB issued Accounting Standards Update ("ASU") 2010-06, *Improving Disclosures about Fair Value Measurements* which, among other things, amends ASC 820, to require entities to separately present purchases, sales, issuances and settlements in their reconciliation of fair value measurements (i.e., to present such items on a gross basis rather than on a net basis), and which clarifies existing disclosure requirements provided by ASC 820 regarding the different respective factors used to measure fair value for each of the three levels of the fair value hierarchy.

As of September 30, 2023, and 2022 the available-for-sale securities fair value were measured and recorded using inputs considered as Level 1.

### Property and Equipment

Property and equipment are stated at cost. Depreciation is being provided using the straight-line method of accounting over the estimated useful lives of the properties. Disbursements or liabilities incurred for repairs and maintenance are expensed as incurred, while additions and betterments are capitalized. When assets are sold, retired or otherwise disposed of, their cost and related accumulated depreciation or amortization are removed from the accounting records and any gain or loss is included in current operations. Leasehold improvements are amortized over the lesser of the estimated useful life of the asset or the term of the lease.

Estimated useful lives by major class of property and equipment are as follow:

| Classes of assets | Estimated useful lives |
|---|---|
| Furniture and fixtures | 3 to 10 years |
| Vehicles | 5 years |
| Leasehold improvements | 5 to 10 years |

8

**CARIBBEAN RETAIL VENTURES, INC.**
NOTES TO BALANCE SHEETS
September 30, 2023, and 2022

## 1. Summary of the Business and Significant Accounting Policies (continued)

### Impairment of Long-lived Assets

The Company follows Statement of Financial Accounting Standards FASB ASC 360, which addresses the measurement and reporting for impairment of all long-lived assets. It also broadens the definition of what may be presented as a discontinued operation in the statement of operations to include defined components of a company's business. FASB ASC 360 requires that long-lived assets currently in use be written down to fair value when considered impaired. Long-lived assets to be disposed of are written down to lower of cost or fair value less estimated costs to sell. FASB ASC 805 and 360, respectively, further provides for a probability-weighted cash flow estimation approach when determining impairment issues related to its property. No impairment has been determined for the years ended September 30, 2023, and 2022, respectively.

### Income Taxes

Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the balance sheets carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carry forwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recorded or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

Accounting standards prescribe a recognition threshold and measurement attribute for financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more-likely-than-not to be sustained upon examination by taxing authorities. The company understands that there are no material uncertain tax positions to be accounted for in the balance sheets. Interests and penalties assessed, if any, by income taxing authorities are included in operating expenses.

### Fair Value of Financial Instruments

Unless otherwise indicated, the fair values of all reported assets and liabilities which represent financial instruments, none of which are held for trading purposes, approximate the carrying values of such amounts.

### New Accounting Pronouncements

#### ASU 2016-02

In February 2016, the FASB issued ASU 2016-02, *Leases (Topic 842)*, which require leases to be recorded as an asset on the balance sheet for the right to use the leased asset and a liability for the corresponding lease obligation for leases with terms of more than twelve months. ASU 2016-02 is effective for non-public companies for fiscal years beginning after December 15, 2019, with early adoption permitted.

On May 20, 2020, the Financial Accounting Standards Board issued the ASU 2020-05 to delay the implementation and effectives dates of the *Topic 842 – Leases* for annual reporting periods beginning after December 15, 2021, and interim reporting periods within annual reporting periods beginning after December 15, 2022. The delay responds to support and assist stakeholders during the Coronavirus Disease 2019 (COVID-19) pandemic.

The Company, due to several factors, have not adopted the provisions of the ASU 2016-02 and is evaluating the impact of the pronouncement may have on the balance sheets.

#### ASU 2016-13

In June 2016, the FASB issued ASU 2016-13, Financial Instruments - Credit Losses (Topic 326). This guidance represents a significant change in the accounting model for credit losses by requiring immediate recognition of management's estimates of "current expected credit losses".

9

**CARIBBEAN RETAIL VENTURES, INC.**
NOTES TO BALANCE SHEETS
September 30, 2023, and 2022

## 1. Summary of the Business and Significant Accounting Policies (continued)

Under the prior model, losses were recognized only as they were incurred, which FASB has noted delayed recognition of expected losses that might not yet have met the threshold of being probable. The new model is applicable to all financial instruments that are not accounted for at fair value through net income, thereby bringing consistency in accounting treatment across different types of financial instruments and requiring consideration of a broader range of variables when forming loss estimates. This change affects any entity holding financial instruments (ie: trade receivables or investments in debt securities). The effect of adoption of this standard will be to accelerate the recognition of credit losses. The effective date of this standard is for years beginning after December 15, 2022, with early adoption allowed.

## 2. Related Parties Transactions

The Company is related, through common ownership and management, with other companies engaged in consulting services and the real estate industry. The related companies consist of BAS Ventures, Inc. and Nadlan Investments Corp. These companies are part of a controlled group, as defined in the Puerto Rico Internal Code.

Also, the Company has transactions with other affiliated companies such as transfers of merchandise at cost and loan advances which are non-interest bearing, with no due date. These transactions with its related parties are collected in the normal course of business. Also, these companies share their administrative facilities, systems, and resources.

The Company has one certificate of deposit in the amount of $1,510,600 which serves as collateral of a loan obtained by one of the affiliated companies.

The amounts due from related parties as of September 30, 2023, and 2022, amount to $4,132,778 and $3,802,590, respectively, the advances from affiliates have been classified as current without regard to whether such amounts will be collected within the next twelve months.

## 3. Investment in Marketable Debt Securities

The amortized cost, gross unrealized holding losses, and fair value of available-for-sale investment securities as of September 30, 2023, and 2022 are as follows:

|  | 2023 | | |
|---|---|---|---|
|  | Cost | Gross unrealized holding Losses | Fair value |
| Municipal Bonds | $ 66,754 | $ ( 813) | $ 65,941 |

|  | 2022 | | |
|---|---|---|---|
|  | Cost | Gross unrealized holding Losses | Fair value |
| Municipal Bonds | $ 106,803 | $ ( 23,475) | $ 83,328 |

The maturities of these debt securities are on July 1, 2028.

CARIBBEAN RETAIL VENTURES, INC.
NOTES TO BALANCE SHEETS
September 30, 2023, and 2022

## 4. Non-revolving Note Payable

In December 2020, the Company entered into a non-revolving loan agreement of $2,235,000 for the purchase of equipment, bearing interest at 4.95%. The loan terms are 26 installments of interest and thereafter 96 installments of $28,324 until March 23, 2031. The balance as of September 30, 2023, is $2,121,164. The loan is collateralized by the equipment acquired and due in the 2030. Maturities are as follows:

| Year ending September 30: | Amount |
|---|---|
| 2024 | $ 238,762 |
| 2025 | 251,045 |
| 2026 | 263,959 |
| 2027 | 277,538 |
| 2028 and thereafter | 1,089,860 |
| | $ 2,121,164 |

The non-revolving loan agreement contains certain covenants which, among other things, restrict the payments/declaration of dividends if the Company is not in compliance with the financial covenants and without bank consent restrict the Company of making advances to or invest in any other corporations, ventures, or business, enter in mortgages or liens, or other kind of debt and sell, transfer or exchange of assets.

## 5. Capital lease obligations

The Company leases vehicles under financial lease obligations expiring through May 2028. The remaining lease payments under finance leases follows:

| Year ending September 30, | |
|---|---|
| 2024 | $ 78,360 |
| 2025 | 57,090 |
| 2026 | 50,542 |
| 2027 | 61,677 |
| 2028 | 47,312 |
| Total lease payments | 294,981 |
| Less: Interest | ( 28,686) |
| Present value of lease liabilities | $ 266,295 |
| Less: current maturities | ( 68,061) |
| Lease obligations, net of current maturities | $ 198,234 |

## 6. Income Taxes

The Company files income tax returns in the Commonwealth of Puerto Rico. In the normal course of business, the Company is potentially subject to income tax audits in by the tax authorities for its taxable years 2020 to 2023, until the applicable statute of limitations expire. Tax audits by their nature are often complex and can require several years to complete.

The tax provision for the years ended in 2023 and 2022 differs from the expenses that would result from applying statutory rates to income before income taxes because of permanent differences in meals and entertainment, travel, and charitable contributions.

## 8. Treasury Stock

The Company enters into a stock purchase agreement for the acquisition of 25% of its common stock on $3,000,000 which is payable, with no bearing interest, on 120 monthly installments of $25,000.

11

**CARIBBEAN RETAIL VENTURES, INC.**
NOTES TO BALANCE SHEETS
September 30, 2023, and 2022

## 8. Treasury Stock - continued

It was also agreed that on September 30th of each fiscal year the stock sellers should deliver to the Company stock certificates equivalent to the total payments received during the period.

As of September 30, 2023, total payments amounted to $2,700,000 and 5,400 shares, representing 18% of the Company's issued and outstanding common stock, have been accordingly received. The transactions are recorded as treasury stock acquired at cost.

## 9. Changes in Accumulated Other Comprehensive Income

Changes in Accumulated Other Comprehensive Income (Losses) for the year ended September 30, 2023, and 2022 were:

| | | |
|---|---|---|
| Accumulated comprehensive losses on available-for-sale securities as of September 30, 2021 | $ | (14,270) |
| Other comprehensive loss | | ( 9,205) |
| Accumulated comprehensive losses on available-for-sale securities as of September 30, 2022 | | (23,475) |
| Less: reclassification adjustment for realized losses included in net income | | 24,288 |
| Accumulated comprehensive losses on available-for-sale securities as of September 30, 2023 | $ | ( 813) |

## 10. Lease Commitments

The Company operates stores at different municipalities around Puerto Rico under non-cancelable leases with various ending dates that are recorded as operating leases. Some of the leases expired and continued month to month, but management estimates that shall be renewed at their next termination date. Future minimum lease payments under all non-cancelable operating leases which the latest expire in June 2032 are as follows:

| Year ending September 30: | Amount |
|---|---|
| 2024 | $ 2,834,825 |
| 2025 | 2,216,323 |
| 2026 | 1,647,936 |
| 2027 | 1,158,759 |
| 2028 | 777,929 |
| Thereafter | 1,518,381 |
| | $ 10,154,153 |

The operating leases that are on a month-to-month basis amounted to an annual rent of $6,681,016 as of September 30, 2023. Rental expenses under all lease agreements as of September 30, 2023, and 2022 amounted to $9,529,841 and $9,447,323, respectively.

## 11. Concentrations of credit risk

Financial instruments which potentially subject the company to concentration of credit risk consist principally of cash. The Company maintains their cash in bank deposit accounts at high credit quality financial institutions. The balances, at times, may exceed federally insured limits.

12

CARIBBEAN RETAIL VENTURES, INC.
NOTES TO BALANCE SHEETS
September 30, 2023, and 2022

## 12. Subsequent Events

The Company evaluated subsequent events through April 19, 2024, which is the date the balance sheets were available to be issued. No events have occurred subsequent to the balance sheet date, and the date the balance sheets were available to be issued that would require additional adjustment, to or disclosure in the balance sheets.

\*\*\*